IN THE MATTER OF: EVA LEONIA GRACE POPE, MINOR CHILD

No. COA00-873

(Filed 5 June 2001)

**Termination of Parental Rights— progress in therapy—probability of repeated neglect**

The trial court correctly terminated respondent's parental rights pursuant to N.C.G.S. § 7B-1111(1) where respondent argued that she had complied with all of the services recommended and had made good progress in therapy, but the court found that she had made no progress and concluded that there was a probability of a repetition of neglect if the child was returned to respondent's custody.

Judge TYSON dissenting.

Appeal by respondent mother from judgment filed 9 May 2000 by Judge Shirley H. Brown in Buncombe County District Court. Heard in the Court of Appeals 8 May 2001.

*Charlotte A. Wade for Buncombe County Department of Social Services, petitioner-appellee.*

*Michael E. Casterline for Rachel Emily Pope, respondent-appellant.*

*Attorney Advocate Judy N. Rudolph for Guardian ad Litem, Cindy Sellars,-appellee.*

GREENE, Judge.

Rachel Emily Pope (Respondent) appeals a judgment filed 9 May 2000 terminating her parental rights as the mother of Eva Leonia Grace Pope (the minor child).

The record shows that on 1 June 1999, the Buncombe County Department of Social Services (DSS) filed a petition, in pertinent part, to terminate the parental rights of Respondent pursuant to N.C. Gen. Stat. § 7A-289.32(2)[1] (neglect) and N.C. Gen. Stat. § 7A-289.32(3)[2]

---

1. Repealed by Session Laws 1998-202, s. 5, effective July 1, 1999. See now § 7B-1111(a)(1) (1999).

2. Repealed by Session Laws 1998-202, s. 5, effective July 1, 1999. See now § 7B-1111(a)(2) (1999).

(willfully leaving minor child in foster care for more than 12 months). The trial court held hearings on the petition on 22 October 1999, 16 November 1999, and 17 November 1999. Subsequent to the hearings, the trial court made the following pertinent findings of fact:

12. That [DSS] initially filed a juvenile petition February 26, 1998, alleging that the minor child was an abused and neglected child. That the allegations of abuse were based on the physical condition of the minor child, who was then 9 months old and had been admitted to Memorial Mission Hospital on February 23, 1998, for failure to thrive. At the time of admittance to the hospital, the minor child weighed only a little over 12 pounds; she was below the 5th percentile for her age; and, presented as a typical 3 month old instead of 9 months old. The minor child could not sit up independently, would not attempt to push herself up if lying on her stomach, had difficulty grasping objects, and she continually held her arms in an upright position at a 90 degree angle.

13. That the allegations of neglect in the original juvenile petition were that the minor child had not been examined by a pediatrician since her birth but had only seen chiropractors and naturopatic doctors, and that the hospital physicians had ruled out medical reasons for the [minor] child's condition, indicating that the cause of the [minor] child's condition was the failure of [Respondent] to provide proper care for the [minor] child.

14. That on April 23, 1998, [Respondent] consented to an adjudication of neglect in that the minor child did not receive the proper care and supervision from [Respondent], and did not receive the necessary medical care from [Respondent]. In the adjudication[,] [Respondent] consented to all the allegations contained in the juvenile petition, and stated to the court that she did not understand the extent of the minor child's physical needs, but that she now understands those needs since reading the medical records.

. . . .

18. That Ms. Foster [the sister of Respondent,] is a resident of Buncombe County, North Carolina. That Ms. Foster returned to Raleigh in February, 1998, at which time [Respondent] allowed Ms. Foster to bring the minor child back with her to Buncombe

County for a visit. That Ms. Foster was extremely concerned about the minor child's condition in that the child was listless; she la[y] without moving; her arms were raised over her head at a 90 degree position; and she was emaciated. Due to her concerns, Ms. Foster took the minor child to see Dr. Sechlar at Asheville Pediatrics on February 23, 1998, at which time Dr. Sechlar immediately admitted the child to Memorial Mission Hospital for failure to thrive.

. . . .

20. That while the [minor] child was hospitalized, the hospital staff was concerned about [Respondent's] behaviors. That the staff attempted to discuss with [Respondent] the [minor] child's condition and needs, but [Respondent] would respond by talking about her ([Respondent's]) problems. [Respondent] was never willing to discuss or acknowledge that [the minor] child was starving to death at the time the [minor] child was admitted to the hospital.

21. That the minor child was starving to death before [Respondent's] eyes. Nevertheless, [Respondent] testified at this hearing that the minor child was fine, healthy, happy, well fed, and reaching all her developmental milestones until Ms. Foster took the child to Buncombe County, and that the child's problems all began due to th[e] change in her environment. [Respondent] testified that all the problems were the fault of Ms. Foster, and the only problem [Respondent] needed to fix was to get the minor child a pediatrician.

22. That [DSS] provided many services to [Respondent] to aid her in correcting the conditions which led to the removal of the minor child from her care. [Respondent] has had a psychological evaluation; has been referred to and attended Dialectic Behavior Therapy sessions at Blue Ridge Center; has participated in and completed parenting classes; and has visited with the child on a regular basis. That [Respondent] has made no progress even with all these services, and even after 21 months [Respondent] is still insisting that it was solely Ms. Foster's fault that the minor child is in the custody of [DSS]. That [Respondent] has no insight as to the reason that [DSS] became involved in this case, and still lacks any understanding of the seriousness of [the minor] child's condition in February, 1998.

23. That [Respondent] had a psychological evaluation done on April 23, 1998, and a copy of said evaluation was admitted into evidence and is incorporated herein by reference as though fully set out herein. That [Respondent] has a personality disorder with seriously disturbed thinking. Her psychological condition is difficult to change; and change would require that [Respondent] be highly motivated to change; and that she acknowledge her problems and work diligently in therapy to change her thinking. That without effective treatment for her personality disorder, there would be a high risk that [Respondent] would continue to treat the minor child as she has done in the past. That [Respondent] has a very high IQ and is able to function well to meet her own needs.

24. That [Respondent] testified at this hearing that she did not agree with the psychological evaluation; denied that she had any disturbed thinking; denied that she had done anything to place the minor child at risk; testified that the only reason [DSS] had taken custody was due to the fault of Ms. Foster; and testified that the only thing she would change if the [minor] child was returned to her care would be to get the [minor] child a pediatrician. That [Respondent] testified[,] . . . "I've racked my brain trying to figure out" why the minor child was starving to death in February, 1998, but did not know why that had occurred.

25. That [Respondent] has been provided supervised visits twice a week at [DSS]. That these visits were supervised by the social worker, who used these supervised visits to show [Respondent] appropriate child care skills. That the social worker requested that [Respondent] be prepared to feed the [minor] child at these visits, and had referred [Respondent] to nutritional services so she could learn what and how to feed [the minor] child. Despite these efforts, [Respondent] continued to try [to] feed the [minor] child inappropriately both in the manner she tried to feed her and the food she brought to feed the [minor] child. Even after being told that the [minor] child could have an allergic reaction to strawberries, [Respondent] brought strawberries to feed the [minor] child. Further, [Respondent] continued to place the [minor] child in risky situations; specifically, on one occasion[,] [Respondent] stood on a toddler's chair, placed the minor child on a window sill and let go of the [minor] child. That the room this occurred in had cement floors. That the social worker had to intervene to tell [Respondent] that this was dangerous, but

[Respondent] did not appear to care or understand. That the social worker had to instruct [Respondent] to take the [minor] child down from the windowsill.

. . . .

31. That it is clear to the court that [Respondent] dearly loves [the minor child], and that [Respondent] has made within the limits of her ability a sincere effort to be reunited with [the minor child] and to comply with court orders. However, there is no evidence at all that with all her efforts [Respondent] is now or will ever be able to provide for [the minor child] in a way that would allow [the minor child] to grow up healthy, happy and well developed; nor is there any evidence that would give this court the hope that [Respondent] could in the near future make the changes necessary to allow the [minor] child to be placed back with [Respondent] safely.

The trial court then made the following pertinent conclusion of law:

3. That the Court finds by clear, cogent and convincing evidence that grounds exist to terminate the parental rights of [Respondent] pursuant to N.C.G.S. 7B-1111[(a)](1) in that she has neglected the minor child when the minor child was placed into the custody of [DSS], she ha[s] continued to neglect the minor child while the [minor] child has been in the custody of [DSS] and it is reasonably probable that she would continue to neglect the minor child if she were returned to her care[.]

The trial court then ordered the termination of Respondent's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) (neglect), N.C. Gen. Stat. § 7B-1111(a)(2) (willfully left in foster care), and N.C. Gen. Stat. § 7B-1111(a)(3) (willfully failed to pay support).

The dispositive issue is whether the trial court's findings of fact support a conclusion of law that there is a probability of repetition of neglect if the minor child were returned to Respondent.[3]

3. Although Respondent assigns error to the trial court's findings of fact numbers 12 through 26, Respondent does not argue in her brief to this Court that these findings of fact are not supported by clear and convincing evidence in the record. Thus, this Court is bound by the trial court's findings of fact. *See Baker v. Log Systems, Inc.*, 75 N.C. App. 347, 350-51, 330 S.E.2d 632, 635 (1985) (where appellant does not bring forth in her brief exceptions to findings of fact, she is deemed to have abandoned them under Rule 28(b)(5) of the North Carolina Rules of Appellate Procedure).

Respondent argues "the trial court erred when it concluded that [Respondent] would continue to neglect the minor child when [Respondent] had complied with all of the services recommended and had made good progress in therapy." We disagree.

Neglect, within the meaning of N.C. Gen. Stat. § 7B-101(15), is one of the grounds which can support the termination of parental rights. N.C.G.S. § 7B-1111(a)(1) (1999). To prove neglect in a termination case, there must be clear and convincing evidence: (1) the juvenile has not, at the time of the termination proceeding, "receive[d] proper care, supervision, or discipline from the juvenile's parent . . . or . . . is not provided necessary medical care," N.C.G.S. § 7B-101(15) (1999); *In re Ballard,* 311 N.C. 708, 716, 319 S.E.2d 227, 232 (1984); and (2) the juvenile has sustained "some physical, mental, or emotional impairment . . . or [there is] a substantial risk of such impairment as a consequence of [such] failure," *see In re Safriet,* 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993). If there is no evidence of neglect at the time of the termination proceedings, however, parental rights may nevertheless be terminated if there is a showing of a past adjudication of neglect and the trial court finds by clear and convincing evidence a probability of repetition of neglect if the juvenile were returned to the parent. *Ballard,* 311 N.C. at 716, 319 S.E.2d at 232. Thus, the petitioner need not present evidence of neglect subsequent to the prior adjudication of neglect. *See In re Caldwell,* 75 N.C. App. 299, 302, 330 S.E.2d 513, 516 (1985).

In this case, Respondent did not have custody of the minor child at the time of the termination proceedings. The trial court, therefore, did not make any findings the minor child was neglected at the time of the termination proceedings. The trial court, however, made findings there had been a previous adjudication of neglect in 1998. The 1998 adjudication of neglect was based on findings the minor child "was starving to death" while in Respondent's custody and suffered from "failure to thrive"; "hospital physicians had ruled out medical reasons for the [minor] child's condition, indicating that the cause of the [minor] child's condition was the failure of [Respondent] to provide proper care for the [minor] child"; and Respondent did not seek medical care for the minor child. Although Respondent utilized many services provided by DSS subsequent to the 1998 adjudication of neglect, the trial court found as fact Respondent "made no progress even with all these services" and Respondent "still lacks any understanding of the seriousness of [the minor] child's condition in

February, 1998." The trial court also found as fact that at the time of the termination hearing, Respondent

> denied that she had done anything to place the minor child at risk; testified that the only reason [DSS] had taken custody was due to the fault of Ms. Foster; and testified that the only thing she would change if the [minor] child [were] returned to her care would be to get the child a pediatrician.

Additionally, the trial court found as fact that during Respondent's supervised visitations with the minor child, Respondent continued "to try and feed the [minor] child inappropriately both in the manner she tried to feed her and the food she brought to feed the [minor] child." These findings of fact support a conclusion of law that if the minor child were returned to Respondent's custody, there would be a probability the minor child would not receive proper care from Respondent or proper medical care, and the minor child would sustain physical and/or mental impairment as a result of such failure. It follows that if the minor child were returned to Respondent's custody, there would be a probability of repetition of neglect.[4] Accordingly, the trial court's 9 May 2000 judgment, terminating Respondent's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1), is affirmed.[5]

Affirmed.

Judge TIMMONS-GOODSON concurs.

Judge TYSON dissents.

---

4. We note that the trial court's conclusion of law states "it is *reasonably probable* that [Respondent] would continue to neglect the minor child if she were returned to her care." (Emphasis added.) Although the proper legal standard for determining whether parental rights should be terminated under section 7B-1111(a)(1) is whether there is a *probability* of repetition of neglect, *see Ballard*, 311 N.C. at 716, 319 S.E.2d at 232, this error is harmless because the trial court's findings of fact support a legal conclusion that there is a probability of repetition of neglect, *see In re Bluebird*, 105 N.C. App. 42, 51, 411 S.E.2d 820, 825 (1992) (trial court's failure to correctly state in its order the specific statutory ground for termination is harmless error when the findings of fact support a legal conclusion that grounds for termination exist).

5. Because the trial court properly terminated Respondent's parental rights under section 7B-1111(a)(1), we need not address Respondent's arguments in her brief to this Court that her parental rights were improperly terminated pursuant to section 7B-1111(a)(2) and section 7B-1111(a)(3). *See In re Davis*, 116 N.C. App. 409, 413, 448 S.E.2d 303, 305, *disc. review denied*, 338 N.C. 516, 452 S.E.2d 808 (1994).

**IN RE POPE**

[144 N.C. App. 32 (2001)]

TYSON, Judge, dissenting.

I would reverse the order and remand for further proceedings toward reunification, consistent with the minor child's best interest, in light of the overriding purpose of the Juvenile Code toward reunification of a child with the natural parent. I respectfully dissent from the majority's conclusion that the trial court appropriately entered an order terminating respondent's parental rights.

Because I would hold that the trial court erred in terminating respondent's parental rights based on neglect, G.S. § 7B-1111(1), I will also address the additional independent grounds on which the trial court based termination: (1) respondent's willfully leaving the child in foster care for more than 12 months, G.S. § 7B-1111(2); and (2) respondent's willful failure to pay child support, G.S. § 7B-1111(3). I would hold that there is not clear, cogent and convincing evidence to support either of these additional grounds for the trial court's order terminating respondent's parental rights.

A. Purpose of the Juvenile Code

The essential intent and aim of the Juvenile Code "is to reunite the parent(s) and the child, after the child has been taken from the custody of the parent(s)." *Matter of Shue*, 311 N.C. 586, 596, 319 S.E.2d 567, 573 (1984). G.S. § 7B-100 sets forth the purposes of the Juvenile Code:

> (1) To provide procedures for the hearing of juvenile cases <u>that assure fairness and equity and that protect the constitutional rights of juveniles and parents</u>; (2) To develop a disposition in each juvenile case that reflects consideration of the facts, the needs and limitations of the juvenile, and the strengths and weaknesses of the family; (3) To provide for services for the protection of juveniles by means <u>that respect both the right to family autonomy and the juveniles' needs for safety, continuity, and permanence</u>; and (4) To provide standards for the removal, when necessary, of juveniles from their homes and <u>for the return of juveniles to their homes consistent with preventing the unnecessary or inappropriate separation of juveniles from their parents</u>.

N.C. Gen. Stat. § 7B-100 (1999) (emphasis supplied). The Juvenile Code, including G.S. § 7B-1111, applicable to termination of parental rights, must be interpreted and construed so as to implement these

goals and policies. N.C. Gen. Stat. § 7B-100. I review the record in this case in light of these overriding goals.

### B.  Standard of Review

Our standard of review for the termination of parental rights is whether the court's " 'findings of fact are based upon clear, cogent and convincing evidence' and whether the 'findings support the conclusions of law.' " *In re Huff*, 140 N.C. App. 288, 292, 536 S.E.2d 838, 840 (2000), *appeal dismissed, disc. review denied,* —— N.C. ——, —— S.E.2d —— (No. 523P00) (1 February 2001) (citing *In re Allred*, 122 N.C. App. 561, 565, 471 S.E.2d 84, 86 (1996)); *see also, In re McLemore*, 139 N.C. App. 426, 428, 533 S.E.2d 508, 509 (2000). Our review of the trial court's findings of fact is limited to whether there is competent evidence to support the findings; however, the trial court's conclusions of law are reviewable *de novo. Starco, Inc. v. AMG Bonding and Ins. Services, Inc.*, 124 N.C. App. 332, 335-36, 477 S.E.2d 211, 214-15 (1996).

Clear, cogent and convincing evidence "is greater than the preponderance of the evidence standard required in most civil cases." *In re Montgomery*, 311 N.C. 101, 109-10, 316 S.E.2d 246, 252 (1984) (citation omitted). It has been defined as "evidence which should fully convince." *Williams v. Blue Ridge Bldg. & Loan Ass'n*, 207 N.C. 362, 177 S.E. 176, 177 (1934) (quotation omitted) (emphasis supplied).

### C.  Background

The uncontroverted evidence establishes that, at the time of the hearing, respondent was a thirty-nine year old college-educated woman. Respondent holds an undergraduate B.S. degree in recreational therapy, and has a high level of intelligence. Respondent lived in a home for pregnant and unwed women from February to August, 1997. The baby was born on 25 May 1997 and weighed 7 pounds, 10 ounces. Respondent left California and returned home to North Carolina in December, 1997, where she lived with her parents in Raleigh.

Respondent's sister, Sherry Foster, visited Raleigh during December 1997. During this visit, Ms. Foster took the child to a doctor in Raleigh without respondent's knowledge or permission. The doctor examined the child, and found her to be in satisfactory condition. Also during this visit, Ms. Foster dissuaded respondent from taking the child to the hospital in Raleigh after respondent expressed concern over her child's congestion.

Ms. Foster returned to Raleigh in February 1998. On or about 22 February 1998, respondent consented to Ms. Foster's taking her child to the Foster's home in Asheville ostensively for a visit. On 23 February 1998, Ms. Foster took the child to a doctor in Asheville without respondent's knowledge. The child was admitted to the hospital for "failure to thrive." The child was approximately 9 months old, and weighed approximately 12 pounds. Respondent never regained custody of her child. Despite respondent's requests to have the matter transferred to Wake County, respondent's child remained in Buncombe County. Respondent was forced to relocate her home and secure employment in Asheville in order to be close to her child, and defend the allegations in this case.

### D.  Neglect

I disagree with the majority's opinion that the trial court appropriately terminated respondent's parental rights under G.S. § 7B-1111(1). A prior adjudication of neglect cannot be the sole basis for terminating parental rights. *In re Ballard*, 311 N.C. 708, 713-14, 319 S.E.2d 227, 231 (1984). Rather, in determining neglect, "the trial judge must find evidence of neglect at the time of the termination proceeding." *In re Blackburn*, 142 N.C. App. 607, 611, 543 S.E.2d 906, 909 (2001) (citing *Ballard* at 716, 319 S.E.2d at 232).

Although the record here contains evidence supporting the prior adjudication of neglect, the record must contain clear, cogent and convincing evidence that respondent would continue to neglect the child at the time of the termination proceeding. I would hold that the record does not contain such clear, cogent and convincing evidence as to support the trial court's findings and conclusion that, as of the date of the termination proceeding, respondent would neglect the minor child.

Respondent complied with all court orders, and completed all DSS-recommended services in the case plan to prepare her for reunification with her minor child. The trial court found that respondent made "a sincere effort to be reunited with her daughter and to comply with court orders." Both the trial court and DSS found that respondent "dearly loves [the minor child]" and visits her twice a week. DSS reported to the court that the visits go well, that respondent "is anxious to have the child returned to her care," and that respondent "is willing to do whatever is necessary to have her child returned to her." Respondent testified that she attended and com-

pleted weekly parenting classes over a period of several weeks. The record reflects that respondent attended every class.

The record also reveals that, after completion of the DSS case plan, respondent's ability to care for her minor child improved. DSS submitted a report to the court on 1 June 1998, stating that respondent was nearing completion of parenting classes, and that "[d]uring the supervised visitation [respondent] interacts with [the minor child] appropriately and demonstrates appropriate parenting skills."

On 22 September 1998, DSS further reported to the court that respondent was doing well in her DSS-recommended monthly therapy sessions, and that respondent's therapist, Nancy Mercer, "reports that [respondent] is doing well and that she [Mercer] has no concerns." In a report from Mercer dated 4 March 1999, Mercer states that respondent "has appropriately owned responsibility and regret for the circumstances surrounding her daughter's removal from her custody. . . . [T]he concerns she has presented to me regarding the child have always seemed legitimate and appropriate. . . . [Respondent] appears to be functioning well and has no symptoms of mood, anxiety or substance abuse problems. Her overall attitude has been one of cooperation, willingness and motivation."

I would hold that the record does not contain clear, cogent and convincing evidence that respondent would continue to neglect the child at the time of the termination proceeding, and after respondent's completion of all DSS-required services. The evidence shows respondent's acknowledgment of regret for past decisions regarding the child, and improvement in respondent's ability to care for the child and understand the child's needs. The essential purpose in interpreting G.S. § 7B-1111 is to assure "fairness and equity" for both juveniles and parents, and to work toward reunification while preventing the inappropriate separation of juveniles from their natural parents. See N.C. Gen. Stat. § 7B-100. I cannot agree with the majority's opinion that termination of respondent's parental rights under these circumstances was proper, or that the result reached was "fair and equitable," consistent with the express purposes of G.S. § 7B-100, as interpreted by Shue, supra.

### E.  Willfully Leaving Child in Foster Care

The trial court concluded that respondent violated G.S. § 7B-1111(2), in that respondent "willfully left the child in foster care for more than 12 months without showing to the satisfaction of the

court that reasonable progress under the circumstances has been made within 12 months in correcting those conditions which led to the removal of the child." I would hold that this conclusion is clearly erroneous for the reasons enumerated above. The record does not contain clear, cogent and convincing evidence that respondent failed to show "reasonable progress under the circumstances." To the contrary, the evidence clearly shows that respondent willingly completed all DSS case plan requirements and improved her ability to care for the child.

Moreover, respondent consented to the child's initial placement in non-secure custody with respondent's sister. Respondent regularly visited her child, until her visitation rights ceased in May 1999, approximately 5 months prior to termination of her parental rights. A June 1998 DSS report indicated that respondent had not missed a single session of visitation with her child. Throughout the child's placement with the Fosters, the evidence showed that respondent and Ms. Foster had few discussions, and that their relationship cooled considerably over time. Ms. Foster did not always allow respondent to speak to her child. Ms. Foster also resisted allowing grandparent visitation. Ms. Foster further testified that respondent was upset to learn that the child called the Fosters "Mama" and "Daddy."

The record does not contain clear, cogent and convincing evidence that supports the trial court's conclusion of law that (1) respondent willfully left the child in foster care; and (2) respondent failed to show reasonable progress in her ability to care for the child during the child's placement with DSS. I would reverse and remand.

### F. Willful Failure to Pay Support

The trial court concluded that respondent "for a continuous period of six months. . . has willfully failed for such period to pay a reasonable portion of the cost of care for the minor child although physically and financially able to pay some portion greater than zero," in violation of G.S. § 7B-1111(3). I would hold that the clear, cogent and convincing evidence in the record mandates the opposite conclusion.

The evidence establishes that respondent was never under court order to pay support. The record does not contain any evidence that DSS initiated legal proceedings requiring that respondent pay sup-

port. A DSS witness testified that she was not aware that any such court order had been issued. Respondent also testified that she had "never been under any court order to pay support." Moreover, although DSS knew that respondent had initiated proceedings to require that the child's biological father pay child support in California, there is no evidence that DSS attempted to assist respondent or to follow through in procuring support from the child's biological father.

Notwithstanding the lack of a court order, respondent testified that on many occasions, she stated to the Fosters, "[i]f there's anything you need, just let me know. I can get a hold of it." On various occasions, respondent brought food and clothes to the child. Respondent also requested from DSS a list of the Foster's expenses for the child. DSS did not provide respondent with the requested list.

Respondent testified that the Fosters "were willing to help out" with respondent's own expenses. Ms. Foster testified that the Fosters were willing to help support respondent financially upon her relocation to Asheville. Mr. Foster told respondent, "[w]e're willing to help you," and offered to assist with respondent's rent payments. Ms. Foster further testified that they "never formally asked [respondent] to provide any support for the child," and that the Fosters never contacted the support agency to initiate support proceedings.

The word willful as applied in termination proceedings under the statute has been defined as " 'disobedience which imports knowledge and a stubborn resistance.' " *Bost v. Van Nortwick,* 117 N.C. App. 1, 14, 449 S.E.2d 911, 919 (1994), *appeal dismissed,* 340 N.C. 109, 458 S.E.2d 183 (1995) (quoting *In re Roberson,* 97 N.C. App. 277, 280, 387 S.E.2d 668, 670 (1990)). " 'Willful' has also been defined as 'doing an act purposely and deliberately.' " *Id.* (quoting *Roberson* at 281, 387 S.E.2d at 670).

I cannot agree that the clear, cogent and convincing evidence reveals a *willful* failure to pay support where (1) the record does not establish that respondent was ever under a court order to pay support; (2) Ms. Foster led respondent to believe they were helping respondent with her expenses; and (3) respondent did provide food and clothes to the child while the child was in the Foster's care. The record does not contain clear, cogent and convincing evidence that supports the trial court's conclusion of law that respondent violated G.S. § 7B-1111(3).

In light of the essential aims of the Juvenile Code, I would reverse the trial court's order terminating respondent's parental rights, and remand for further proceedings toward reunification. Accordingly, I respectfully dissent.