518 S.E.2d 799 (1999)
In the Matter of Raymond Matthew LEFTWICH, a minor child born August 9, 1987, and David Edward Ayers, Jr., a minor child born September 1, 1989.
Surry County Department of Social Services, Petitioner,
v.
Helen Lou Leftwich, Respondent-mother, and David Edward Ayers, Sr., Respondent-father.
No. COA98-1567.
Court of Appeals of North Carolina.
September 21, 1999.
*800 Francisco & Merritt, by H. Lee Merritt, Jr., Mt. Airy, for petitioner-appellee.
Donnelly & Dirusso, by F. Christian Dirusso, and Charles R. Briggs, Mt. Airy, for respondents-appellants.
Ann Anderson, Guardian ad litem.
TIMMONS-GOODSON, Judge.
This case involves proceedings terminating the parental rights of Helen Lou Leftwich ("respondent-mother") and David Edward Ayers, Sr. ("respondent-father") (collectively, "respondents") with respect to minor children Raymond Matthew Leftwich ("Matthew"), born 9 August 1987, and David Edward Ayers, Jr. ("David"), born 1 September 1989, on the basis of neglect. Respondents contend that the evidence was insufficient as a matter of law to establish grounds for termination of their parental rights. Having carefully examined the record, we affirm the order of the trial court.
*801 The evidence of record tends to show that respondent-father has been in the custody of the North Carolina Department of Corrections (DOC) since May of 1990, following convictions of armed robbery, second-degree rape, incest, and kidnapping. During his incarceration, respondent-father obtained his GED, and since January of 1996, he has participated in a work-release program allowing him to be gainfully employed while imprisoned. From his earnings, the sum of $472.00 per month has been withheld and forwarded to the Clerk of Superior Court of Surry County as child support for the minor children. Respondent-father has visited the children frequently since 1995, when they came into the custody of the Surry County Department of Social Services (DSS). He also attended foster care agency review meetings at the DSS office in January of 1996 and January of 1997. Upon his release from the DOC, respondent-father intends to resume living with his wife, respondent-mother, and his plan for the minor children is that they reside with both respondents.
The evidence further shows that respondent-mother has a history of chronic alcohol abuse, which resulted in the removal of the minor children from her custody in August of 1992. On or about 4 August 1992, respondent-mother, the sole caretaker of the children, became intoxicated and passed out, thereby leaving her two-year old child, David, to wander outside of the residence until 12:00 a.m. Following this incident, DSS filed a juvenile petition seeking to have the children declared abused, neglected, and dependent, and by order entered 29 September 1992, the children were adjudicated to be abused and neglected and were placed in the custody of their maternal grandmother. In June of 1993, the children were returned to the custody of respondent-mother, and DSS monitored the placement with respondent-mother until 30 March 1995, when DSS was released of further monitoring responsibility by order of the court.
Approximately six weeks later, however, on 20 May 1995, law enforcement officers found the minor child, David, running down Worth Street with no clothing at approximately 12:00 a.m. When the officers brought the child home, no one responded to their knocks at the front door. The officers then went around to the back door, and finding it open, entered the home, where they found respondent-mother passed out on the bed. When she was finally aroused, respondent-mother stated that she did not know the whereabouts of David. She said that she had a babysitter helping her, but she was unaware that the sitter had left. Two quarts of homemade brandy were found on the kitchen table and the house was in disarray. DSS thereafter filed a petition alleging that the children were neglected, and on 11 July 1995, the court entered an order adjudicating the children to be neglected. The children have remained in the custody of DSS since 21 May 1995.
From June of 1995, respondent-mother and DSS have entered into a series of services agreements designed to address and eliminate her alcohol abuse problem, the goal of the agreements being to return the minor children to respondent-mother's custody. In order to accomplish this goal, respondent-mother agreed to confront her alcohol problem and to obtain appropriate counseling and treatment. She further agreed to develop and demonstrate appropriate parenting skills and to attain a financial position that would enable her to support herself and the minor children.
On 5 September 1996, a DSS caseworker, Mary Summerlin, visited the home of respondent-mother and observed her to be in an intoxicated condition. Summerlin transported respondent-mother to a hospital emergency room, and according to the results of a blood alcohol test administered at the hospital, respondent-mother's blood alcohol level was .24. Summerlin tried to convince respondent-mother to voluntarily enter a residential treatment program for her alcohol abuse, but she refused. Later, in November of 1996, respondent-mother's substance abuse counselor at Surry-Yadkin Area Mental Health Authority (SYAMHA), Ingle Armstrong-Sloop, recommended that she enter a residential substance abuse treatment program, but respondent-mother again declined. Although she attended weekly substance abuse counseling and a number of Alcoholics *802 Anonymous (AA) meetings from June of 1995 until November of 1996, respondent-mother's unwillingness to enroll in a more intensive treatment program resulted in the termination of her counseling through SYAMHA. There is no evidence that respondent-mother has resumed any form of alcohol abuse counseling or treatment since November of 1996.
On 20 November 1996, DSS filed a petition to terminate respondents' parental rights as to the minor children. The matter came on for adjudication at the 10 February and 6 March 1997 Juvenile Sessions of Surry County District Court. The trial court entered an order on 15 May 1997 concluding that the minor children were neglected as that term is defined in section 7A-517(21) of the North Carolina General Statutes. The court further concluded that the children had been in foster care for more than twelve months and that respondents had failed to make reasonable progress to correct those conditions that lead to the removal of the children or to show a positive response to DSS's diligent efforts to return the children to their custody. Thereupon, the court decreed that the grounds set forth in DSS's petition seeking termination of respondents' parental rights indeed existed.
A dispositional hearing upon the petition for termination of parental rights was held on 4 September 1997. Following this hearing, the court entered an order on 23 September 1997 finding that there had been no changes regarding respondent-mother's condition since the 6 March 1997 hearing and that respondent-father's plan for the minor children continued to be reunification with himself and respondent-mother upon his release from prison. Based on these findings, the court concluded that "[i]t [was] in the best interest of the minor children that the parental rights of [respondents] be terminated." From the order terminating their parental rights, respondents appeal.
Respondents raise four assignments of error on appeal; however, as to three of these assignments, respondents have failed either to argue them in their brief or to cite any authority supporting them. Accordingly, these assignments, which relate to respondent-father, are deemed to be abandoned, N.C.R.App. P. 28(b)(5), and our discussion is limited to the sole remaining assignment of error, wherein respondents argue that the evidence did not support a finding of neglect by respondent-mother or the probability of its repetition at the time of the termination hearing. Based on our examination of the record, we must disagree.
"The termination of parental rights statute provides for a two-stage termination proceeding: [N.C. Gen.Stat. § 7A-289.30 (1995) ] governs the adjudication stage, and [N.C. Gen.Stat. § 7A-289.31 (1995) ] governs the disposition stage." In re Young, 346 N.C. 244, 247, 485 S.E.2d 612, 614 (1997). At the adjudication stage, the party petitioning for termination of parental rights must demonstrate by clear, cogent, and convincing evidence that one or more of the grounds warranting termination, as set forth in section 7A-289.32 of the North Carolina General Statutes, exist. Id. at 247, 485 S.E.2d at 614. Once the court has determined that grounds for terminating parental rights are present, the court then "moves to the disposition stage to determine whether it is in the best interests of the child to terminate the parental rights." Id. at 247, 485 S.E.2d at 615.
Under section 7A-289.32, the court may terminate parental rights upon a finding that the child is a "neglected child" within the meaning of section 7A-517(21) of the General Statutes. N.C. Gen.Stat. § 7A-289.32(2) (Cum.Supp.1999). Section 7A-517(21) defines "neglected juvenile" as follows:
A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.
N.C. Gen.Stat. § 7A-517(21) (Cum.Supp. 1999). To terminate parental rights based on neglect, the court must find evidence of neglect at the time of the termination proceeding. In re Ballard, 311 N.C. 708, 716, 319 S.E.2d 227, 232 (1984).
During a proceeding to terminate parental rights, the trial court must admit and *803 consider evidence, find facts, make conclusions and resolve the ultimate issue of whether neglect authorizing termination of parental rights under N.C.G.S. 7A-289.32(2) and 7A-517(21) is present at that time. The petitioner seeking termination bears the burden of showing by clear, cogent and convincing evidence that such neglect exists at the time of the termination proceeding.
Id. at 716, 319 S.E.2d at 232 (citations omitted). "Termination of parental rights for neglect may not be based solely on past conditions which no longer exist." Young, 346 N.C. at 248, 485 S.E.2d at 615. Nevertheless, "`a prior adjudication of neglect may be admitted and considered by the trial court in ruling upon a later petition to terminate parental rights on the ground of neglect.'" Id. at 250, 485 S.E.2d at 616 (quoting Ballard, 311 N.C. at 713-14, 319 S.E.2d at 231).
Relying on our Supreme Court's holding in Young, 346 N.C. 244, 485 S.E.2d 612, respondents argue that there was insufficient evidence before the trial court to show neglect and the likelihood of its repetition on the part of respondent-mother. Respondents contend that while there may have been past neglect by respondent-mother, at the time of the termination proceeding, she had made significant efforts to improve her lifestyle, which efforts the trial court chose to ignore. However, our review of the record reveals that at the time of the termination proceeding, respondent-mother had not made any meaningful progress in eliminating the conditions that led to the removal of her children. Although the evidence does suggest that respondent-mother attended weekly substance abuse counseling and regular AA meetings from June of 1995 to November of 1996, the evidence shows that she continued to abuse alcohol and that she refused to enroll in a residential treatment facility as recommended by her substance abuse counselor and a DSS caseworker. Indeed, because of her refusal to enter a more intensive treatment program, her treatment through SYAMHA was terminated in November of 1996, and there is no evidence that she resumed any form of substance abuse counseling or treatment since that time.
In addition to the lack of improvement in respondent-mother's lifestyle, the trial court considered the September 1992 and July 1995 adjudications of neglect in determining whether there was sufficient evidence of neglect to authorize termination of respondent-mother's parental rights. See Young, 346 N.C. at 250, 485 S.E.2d at 616 (stating that court may consider prior adjudication of neglect in ruling upon petition to terminate parental rights). It is significant that in both instances, neglect was based upon respondent-mother's failure to properly care for and supervise the children due to her alcoholism. Furthermore, there was evidence before the court in the form of Guardian Ad Litem Reports which showed the effects of such neglect on the children. Both boys received developmental evaluations following their 1992 placement in DSS custody. Matthew, who was 6 years old at the time, had not been toilet-trained, and he was found to be mildly retarded, socially deprived, and in need of speech therapy and dental care. David, who was 3 years and 9 months old, also was not toilet-trained and his only words were "shut up" and "Mom." David was found to have both mental and language delays and was also in need of dental care. Both children had no experience with basic toys, Play-Doh, or crayons, and although respondent-mother received monthly social security benefits for the children, they had no toys and were frequently dressed in inappropriate clothing. Given the evidence of past neglect in conjunction with the special needs of the children and the evidence that respondent-mother has made no advancements in confronting and eliminating her problem with alcohol, we are convinced that there was clear, cogent, and convincing evidence of neglect and the probability of its repetition at the time of the termination proceeding to support the order terminating respondent-mother's parental rights.
Based upon all of the foregoing, the order of the trial court terminating respondents' parental rights is affirmed.
AFFIRMED.
Judges GREENE and HORTON concur.