An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-359

Filed: 6 October 2015

Forsyth County, Nos. 09 JT 274–75; 12 JT 37–38; 13 JT 141

IN THE MATTER OF: S.V.C., S.D.C., P.R.C., K.L.C., T.C.

Appeal by respondents from order entered 19 December 2014 by Judge Lawrence J. Fine in Forsyth County District Court. Heard in the Court of Appeals 8 September 2015.

> *Theresa A. Boucher for Forsyth County Department of Social Services.*
>
> *Tawanda N. Foster for guardian ad litem.*
>
> *Jeffrey William Gillette for respondent-appellant mother.*
>
> *Sydney Batch for respondent-appellant father.*

BRYANT, Judge.

Where the trial court's findings of fact are supported by competent evidence and, in turn, support its conclusions of law, we affirm the court's order terminating respondents' parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a).

On 28 February and 19 April 2012, the Forsyth County Department of Social Services ("DSS") filed petitions seeking an adjudication that Samantha, Sabrina,

Peter, and Kevin[1] were neglected juveniles. Respondent-father was incarcerated at the time of these filings. The petitions described a lack of proper supervision by respondent-mother that included leaving the children unsupervised or with an inappropriate caretaker; failing to obtain medical care for two-year-old Sabrina after she suffered a dislocated elbow; and lacking a plan to house herself and the children after her own mother ordered them to vacate her residence on 28 March 2012. DSS further alleged a lack of stable housing, "15 previous incidents of domestic violence between" respondent-mother and respondent-father, and an admission to marijuana use by respondent-mother.

On 16 May 2012, the trial court entered an order adjudicating the four children to be neglected. Although respondent-father remained incarcerated, both he and respondent-mother attended the adjudicatory hearing but "stood mute[.]" The court found facts consistent with DSS's allegations but made no findings regarding respondents' domestic violence history. The court ordered respondent-mother to (1) complete mental health and substance abuse assessments through DayMark and comply with all recommendations; (2) attend a WISH intake and comply with all recommendations; (3) submit to random drug screens; (4) complete a parenting capacity/psychological assessment and comply with all recommendations; (5) complete parenting classes through SCAN or the WISH program; (6) establish and

---

[1] Pseudonyms are used to protect the identities of the minor children pursuant to N.C. R. App. P. 3.1(b).

maintain for a six-month period both stable housing and the financial means to provide for her children's basic needs; and (7) attend the children's medical appointments. Respondent-father was ordered to enter into an out-of-home service agreement and visitation plan with DSS upon his release from confinement.

Respondent-father remained incarcerated at the time of the July 2012 review hearing but was present and represented by counsel. The trial court ordered him to (1) complete a parenting capacity and psychological evaluation and comply with its recommendations; (2) complete a substance abuse assessment through DayMark and comply with all recommendations; (3) attend the Strong Fathers Program; and (4) send cards, letters, and pictures to the children through DSS. The court also ordered respondent-father to submit to random drug screens requested by DSS after his release.

In a January 2013 review order, the court found that respondent-father had entered a case plan with DSS after being released from federal custody. In addition to the previously-ordered conditions for reunification, the court ordered respondent-father to complete a domestic violence assessment and follow any recommendations; establish and maintain stable housing and finances; and obtain employment.

The trial court held a permanency planning hearing on 25 February 2013 and established a permanent plan of reunification. The court found that respondent-mother had failed to attend a scheduled appointment with therapist Wanda Brown-

Ramseur, who had agreed to serve as the single service provider for respondent-mother's several needs. Respondent-mother had also twice tested positive for marijuana in January 2013 and had informed her DSS social worker that she was pregnant but intended to have an abortion. The social worker encouraged respondent-mother to obtain prenatal care. Finding that domestic violence "may[ ]be an issue" with respondent-father, the court again ordered him to obtain an assessment.

On 26 June 2013, DSS filed a juvenile petition alleging that newborn Thomas was neglected and dependent. The trial court adjudicated Thomas dependent on 18 September 2013, upon respondent-mother's admission to DSS's allegations. The court found that: respondent-mother and Thomas tested positive for marijuana at the time of his birth; respondent-mother admitted having used marijuana during the pregnancy; the four older children had been in DSS custody since March 2012; she was noncompliant with the conditions of her case plan, including substance abuse treatment; and a psychological evaluation had determined she was "unlikely to make significant changes in her lifestyle to be in a position to parent her children appropriately." The court further found that respondent-mother "has extensive history with [DSS]" and that her four older children had previously been "taken into [DSS] custody due to severe domestic violence issues between [respondent-mother]

and [respondent-father]."[2]  Finally, it found that respondent-mother lacked stable housing when the petition was filed and had since obtained an apartment with respondent-father.  The court ordered her to attend Thomas' medical appointments; to comply with the recommendations of therapist Ms. Ramseur-Brown regarding issues of domestic violence, anger management, medication management, and substance abuse; to submit to random drug screens; to establish financial stability; and to obtain appropriate housing separate from respondent-father.

On 2 October 2013, the trial court changed the four elder children's permanent plan to guardianship with a concurrent plan of adoption.  The court found that respondents continued to share an apartment and that "this residence is not a safe, stable home as the issue of domestic violence between [respondent-mother and respondent-father] has not yet been addressed."  The court made additional findings that respondent-father had been arrested on 16 August 2013 for felony possession with intent to distribute marijuana and other charges; that respondent-mother had been arrested on the same date for resisting a public officer; that Ms. Ramseur-Brown had advised respondent-mother she could not effectively address her domestic violence issues if she continued to have contact with respondent-father; that respondent-mother had expressed a willingness to cease contact with respondent-

---

[2] Although DSS's petition and the trial court's order date this incident to November 2012, it appears the children were taken into DSS custody due to respondents' "ongoing domestic violence issues" in November 2009.

father in the interest of her children; and that respondent-father was unwilling to cease contact with respondent-mother.

After a hearing on 10 February 2014, the trial court ceased reunification efforts and changed the children's permanent plans to adoption. The court noted that respondent-mother posted on Facebook that she was pregnant. When queried by the court, respondent-mother denied the pregnancy but acknowledged that she made the Facebook posting. After a subsequent review hearing on 7 May 2014, the court found that respondent-mother was in fact pregnant, reportedly by respondent-father, and had informed her DSS social worker that her due date was 13 September 2014. Respondent-mother had also been arrested and charged with felonious larceny of children's clothing on 31 March 2014 and made several Facebook postings about "name brand clothes for children."

DSS filed a petition for termination of respondents' parental rights on 7 May 2014. After hearing evidence on seven days between 20 August and 17 October 2014, the trial court entered an order terminating respondents' parental rights on 19 December 2014. As to each respondent, the court adjudicated grounds for termination based on neglect, failure to make reasonable progress to remedy the conditions that led to the children's placement outside the home, and dependency pursuant to N.C. Gen. Stat. §§ 7B-1111(a)(1), (2), (6) (2013). The court found an additional ground to terminate the parental rights of respondent-father for failure to

legitimate his children pursuant to N.C.G.S. § 7B-1111(a)(5) (2013).  Respondents each filed timely notice of appeal.[3]

_____

Both respondents challenge the trial court's adjudication of grounds to terminate their parental rights under N.C.G.S. § 7B-1111(a).  We review an adjudication to determine whether the court's findings of fact are supported by competent evidence, and whether its findings in turn support its conclusions of law. *In re McCabe*, 157 N.C. App. 673, 679, 580 S.E.2d 69, 73 (2003); *In re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000).  Uncontested findings are deemed to be supported by the evidence for purposes of our review.  *In re H.S.F.*, 182 N.C. App. 739, 742, 645 S.E.2d 383, 384 (2007).  Moreover, "erroneous findings unnecessary to the determination do not constitute reversible error" where an adjudication is supported by sufficient additional findings grounded in competent evidence.  *In re T.M.*, 180 N.C. App. 539, 547, 638 S.E.2d 236, 240 (2006).  A valid adjudication of any single ground under N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental rights.  *In re P.L.P.*, 173 N.C. App. 1, 8, 618 S.E.2d 241, 246 (2005), *aff'd per curiam*, 360 N.C. 360, 625 S.E.2d 779 (2006).

_____

[3] Thomas has a different father who is not a party to this appeal.

## Respondent-Mother's Appeal

Respondent-mother first claims the trial court erred by adjudicating grounds to terminate her parental rights based on neglect. While she does not contest the court's findings of fact,[4] she argues that its findings are insufficient "to support its conclusion that [she] had neglected the children in such a way as to constitute grounds for termination under N.C. Gen. Stat § 7B-1111(a)(1)." We disagree.

Under N.C.G.S. § 7B-1111(a)(1), "[t]he trial court may terminate the parental rights to a child upon a finding that the parent has neglected the child." *In re Humphrey,* 156 N.C. App. 533, 540, 577 S.E.2d 421, 427 (2003). A "neglected" juvenile is defined, *inter alia,* as one "who does not receive proper care, supervision, or discipline from the juvenile's parent . . .; or who has been abandoned; . . . or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare[.]" N.C. Gen. Stat. § 7B-101(15) (2013). Furthermore,

> [N]eglect must exist at the time of the termination hearing, or if the parent has been separated from the child for an extended period of time, the petitioner must show that the parent has neglected the child in the past and that the parent is likely to neglect the child in the future.

*In re C.W.,* 182 N.C. App. 214, 220, 641 S.E.2d 725, 729 (2007).

---

[4] Respondent-mother argues that finding of fact 72 is misleading. However, this finding of fact, which implies that respondent-mother gave a child with a known peanut allergy a peanut product, is unnecessary to an adjudication under N.C.G.S. § 7B-1111(a)(1). *See In re T.M.,* 180 N.C. App. at 547, 638 S.E.2d at 240.

Where a child has been removed from the parent's custody prior to the termination hearing, our Supreme Court has adopted the following standard for adjudicating grounds for termination based on neglect:

> [E]vidence of neglect by a parent prior to losing custody of a child—*including* an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights. The trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect. The determinative factors must be the best interests of the child and the fitness of the parent to care for the child at the time of the termination proceeding.

*In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984) (emphasis added) (citation omitted). Under *Ballard*, therefore, a prior adjudication of neglect is admissible to prove a history of neglect by the parent but is not required. Other "evidence of neglect by a parent prior to losing custody of a child" may also be used to establish a history of neglect. *Id.*

In the case *sub judice*, Sabrina, Samantha, Peter, and Kevin were previously adjudicated neglected on 8 August 2012. Although Thomas was adjudicated as dependent, the fact that he tested positive for marijuana at birth, combined with respondent-mother's admitted marijuana use during the pregnancy and her neglect of Thomas' four siblings, constitutes substantial evidence of prior neglect for purposes of N.C.G.S. § 7B-1111(a)(1). *See In re M.J.G.*, 168 N.C. App. 638, 647, 608 S.E.2d 813, 818 (2005) ("The . . . fact that the mother tested positive for marijuana use on the day

MJG was born, that another child had been adjudged abused and neglected, that the mother was unemployed, and that her whereabouts were unknown at the time the petition was filed support the conclusion that MJG was neglected."); *cf. In re L.G.I.*, __ N.C. App. __, __, 742 S.E.2d 832, 835 (2013) (holding that "a written order of adjudication [of neglect] based on [the juvenile]'s positive morphine test and respondent-mother's use of illegal drugs while pregnant . . . complied with North Carolina General Statute § 7B-807"). Thus, the issue before this Court is whether the trial court's findings further show "the probability of a repetition of neglect" if the children were returned to respondent-mother's care. *Ballard*, 311 N.C. at 715, 319 S.E.2d at 232; *In re L.O.K.*, 174 N.C. App. 426, 435, 621 S.E.2d 236, 242 (2005).

In support of its adjudication under N.C.G.S. § 7B-1111(a)(1), the trial court found and concluded as follows:

> [Respondent-mother] has neglected [the children]. [Samantha, Sabrina, Peter and Kevin] were adjudicated to be Neglected on May 16, 2012. [Thomas] was adjudicated to be a Dependent child on August 21, 2013. [Respondent-mother] has failed to complete virtually all the requirements of the Juvenile Court which were specifically designed to facilitate reunification in a safe home. Return of the children . . . to the care custody and control of [respondent-mother] would very likely result in a repetition of neglect.

The court also made detailed findings regarding respondent-mother's noncompliance with the requirements of her case plan, including mental health and substance abuse treatment, over a period of more than two years. We conclude that respondent-

mother's prolonged failure to address the issues of housing instability, mental illness, and substance abuse fully supports the trial court's conclusion that she was likely to neglect the children if they were returned to her custody. *See In re S.D.J.*, 192 N.C. App. 478, 485–87, 665 S.E.2d 818, 823–24 (2008) (citing *In re Leftwich*, 135 N.C. App. 67, 72, 518 S.E.2d 799, 803 (1999); *In re Davis*, 116 N.C. App. 409, 414, 448 S.E.2d 303, 306 (1994)). Her parental rights were thus subject to termination pursuant to N.C.G.S. § 7B-1111(a)(1).

We are unpersuaded by respondent-mother's argument that the trial court "cannot use her marijuana consumption as a basis for finding neglect without making findings that explain how her use of the substance caused or contributed to such neglect." The court's uncontested findings include the following:

> 27. On October 8, 2012, [respondent-mother] submitted to a Parenting Capacity and Psychological Assessment with Dr. Chris Sheaffer. . . . Dr. Sheaffer diagnosed [respondent-mother] with Personality Disorder with mixed anti-social and borderline traits. [Respondent-mother] tested for a Verbal IQ score of 71, which was in the 3rd percentile, indicated borderline to significant cognitive deficit. [She] reported a chronic history of use of marijuana.
>
> 28. Dr. Sheaffer reported that "Statistically, approximately 20% of individuals with [respondent-mother's] level of intellectual and functional abilities are able to successfully parent children when provided with at least moderate community support. . . . .
>
> 29. [Respondent-mother] had a poor grasp of the developmental needs of her children and children under [respondent-mother's] care would be at substantially

increased risk of harm.

30. *Dr. Sheaffer strongly recommended:*
   - *[Respondent-mother] ceases marijuana use and displays a significant period of time in which she demonstrates a willingness and ability to remain substance free. . . .*

. . .

31. If [respondent-mother] is considered to have met those three recommendations, Dr. Scheaffer then recommended:
   - Individual, instructive, and behaviorally oriented counseling provided by an individual with experience and training with clients who have developmental disabilities and substance abuse dependence. Counseling should address relationship issues, general parenting and behavioral management, and functional life skills.

32. *Based upon the Expert opinion of Dr. Sheaffer, the Court finds it very unlikely that [respondent-mother] will make significant progress in any therapeutic program in the absence of successfully completing the recommendations described above.*

33. [Respondent-mother's] prognosis is quite poor and her insight is extremely limited to non-existent.

. . .

44. On February 26, 2013, [respondent-mother] submitted to an assessment with Wanda Brown-Ramseur, MA, LCAS . . . . Ms. Brown-Ramseur identified areas of concern which required attention to be Post Traumatic Stress Disorder (PTSD), Cannibis Dependence, and Intermittent Explosive Disorder. . . . [Respondent-mother] was inconsistent in attending therapy despite Ms. Brown-Ramseur providing transportation for her. . . . Ms. Brown-Ramseur recommended inpatient substance abuse

treatment for [respondent-mother] in March 2014 but [respondent-mother] was noncompliant with that recommendation.

. . .

46. . . . [Respondent-mother] did not complete her treatment with Ms. Brown-Ramseur regarding issues of domestic violence, anger management, substance abuse and safe shelter.

. . .

75. In February 2014, [respondent-mother] made sporadic contacts with Ms. Wanda Brown-Ramseur. She continued to use marijuana . . . . [Respondent-mother] was also pregnant with her sixth child. She was unable to meet the needs of her children.

. . .

88. [Respondent-mother] missed multiple drug screens requested by [DSS] . . . [and] consistently tested positive for marijuana. She failed to take her prescribed psychiatric medications and reported they made her "sleepy". . . .

. . .

122. [Respondent-mother] has been diagnosed with Major Depression, recurrent, severe with psychotic features, Cannabis abuse, alcohol abuse, and borderline intellectual functioning. [She] has failed to engage in necessary mental health and substance abuse treatment which would be required to stabilize her lifestyle and facilitate in providing a safe home for the children. . . .

(emphasis added). We note that respondent-mother's marijuana use was a factor in the four older children's initial adjudication as neglected in August 2012. Her use of

marijuana during her pregnancy also led to Thomas' adjudication of dependency in September 2013. Addressing respondent-mother's habitual marijuana use has been a consistent focus of DSS, her service providers, and the trial court. Without question, the findings show that respondent-mother's use of marijuana is a substantial factor contributing to the probability of a repetition of neglect if Samantha, Sabrina, Peter, Kevin, and Thomas were returned to her care.

Because we affirm the trial court's adjudication under N.C.G.S. § 7B-1111(a)(1), we need not address the remaining grounds for termination found by the trial court. *See In re P.L.P.*, 173 N.C. App. at 9, 618 S.E.2d at 246.

## **Respondent-Father's Appeal**

Respondent-father likewise challenges the trial court's conclusion that he neglected Samantha, Sabrina, Peter, and Kevin under N.C.G.S. § 7B-1111(a)(1). We note that the court reached the following determination, consistent with the standard established in *Ballard*:

> [Respondent-father] has neglected [the children]. Each of the children was adjudicated to be Neglected on May 16, 2012. [Respondent-father] has failed to complete virtually all the requirements of the Juvenile Court which were specifically designed to facilitate reunification in a safe home. Return of the children . . . to the care custody and control of [respondent-father] would very likely result in a repetition of neglect.

*See Ballard*, 311 N.C. at 715, 319 S.E.2d at 232.

Respondent-father argues that his failure to comply with the court-ordered requirements for reunification is "irrelevant[,]" because most of the requirements "had little to nothing to do with the reason his children were removed from his custody." Inasmuch as he was no longer incarcerated and had obtained suitable employment and housing at the time of the termination hearing, respondent-father claims he addressed his limited responsibility for the August 2012 adjudication of neglect and "demonstrated that he was able to adequately provide care for his children." We disagree.

The trial court's dispositional authority over a respondent parent is defined by N.C. Gen. Stat. § 7B-904 (2013). *See In re W.V.*, 204 N.C. App. 290, 293, 693 S.E.2d 383, 388 (2010) ("A trial court may not order a parent to undergo any course of conduct not provided for in [N.C. Gen Stat. § 7B-904.]") (citation and internal quotation marks omitted). Subsection (c) of this statute provides as follows:

> At the dispositional hearing *or a subsequent hearing* the court may determine whether the best interests of the juvenile require that the parent . . . undergo psychiatric, psychological, or other treatment or counseling *directed toward remediating or remedying behaviors or conditions that led to or contributed to the juvenile's adjudication or to the court's decision to remove custody of the juvenile from the parent* . . . . If the court finds that the best interests of the juvenile require the parent . . . [to] undergo treatment, it may order that individual to comply with a plan of treatment approved by the court . . . .

N.C.G.S. § 7B-904(c) (emphasis added). The statute further authorizes the court to order a parent to "[t]ake appropriate steps to remedy the conditions in the home that led to or contributed to the juvenile's adjudication or to the court's decision to remove custody of the juvenile from the parent . . . ." *Id*. § 7B-904(d1)(3) (2013).

Respondent-father was incarcerated at the time the trial court placed the children in DSS custody in April 2012. He remained incarcerated at the time his children were adjudicated neglected in August 2012. In its initial dispositional order, the trial court ordered respondent-father to enter into a case plan with DSS upon his release from detention. At the initial review hearing, however, the court specifically found that respondent-father was incarcerated on drug and weapons charges and ordered him to complete and comply with any recommendations of psychological, parenting capacity, and substance abuse assessments, and to submit to random drug screens following his release.

In his testimony at the termination hearing and in his brief to this Court, respondent-father concedes he was incarcerated from February 2012 until November 2012 on felony drug and weapons charges. Respondent-father's incarceration directly contributed to his children's status as neglected juveniles, as he was unavailable to provide for their care and supervision. We therefore conclude that the trial court did not exceed its statutory authority or abuse its broad dispositional discretion by ordering him to complete and comply with the aforementioned assessments and drug

screens. *See In re A.S.*, 181 N.C. App. 706, 712–13, 640 S.E.2d 817, 821, *aff'd per curiam*, 361 N.C. 686, 651 S.E.2d 883 (2007).

We further hold that the trial court's findings support its adjudication that respondent-father neglected the children under N.C.G.S. § 7B-1111(a)(1). In addition to noting the prior adjudication of neglect entered in August 2012, the court made the following findings establishing a probability of future neglect by respondent-father:

> 36. On January 28, 2013, [respondent-father] submitted to a Parenting Capacity Psychological Assessment with Dr. Chris Sheaffer. Dr. Sheaffer noted that [respondent-father] was 30 years old and had been incarcerated approximately 50% of his life since age 16. [Respondent-father] completed his GED while incarcerated.
>
> . . .
>
> 40. [Respondent-father] meets the criteria for Antisocial Personality Disorder. Antisocial Personality Disorder is a condition characterized by persistent disregard for, and violation of the rights of others . . . [and] is considered to be one of the psychiatric disorders least amenable to treatment.
>
> 41. Dr. Sheaffer recommended that . . . ["a]ny increase in parenting responsibilities (decreased supervision, extended length of visits) should be contingent upon [respondent-father] complying in parenting classes, Strong Fathers, clean drug screens, etc.[,] and demonstrated stability and conformance with societal and legal rules."
>
> . . .
>
> 43. [Respondent-father's] intellect is not too low to parent his children but he is a recidivism risk for illegal behaviors and incarceration.

. . .

50. On May 22, 2013, [respondent-father] began receiving recommended treatment at Daymark Recovery Services . . . to address issues of mental illness and substance abuse with Virginia Jeffers. [Respondent-father] arrived late to the session. . . . This is the only session [he] attended.

. . .

55. . . . [Respondent-father] attended and completed the SCAN Father's Matter parenting class. . . .

56. On June 7, 2013, [respondent-father] completed a Psychiatric Evaluation with Dr. Aida Castillo at Daymark Recovery Services. Dr. Castillo was received by the Court as an Expert in Psychiatry. Dr. Castillo diagnosed [respondent-father] with Major Depressive Disorder with psychotic features, Cannabis Dependence, and Antisocial Personality Traits. [Respondent-father] was prescribed Remeron and Seroquel. Dr. Castillo recommended that [respondent-father] abstain from using marijuana and participate in anger management and mental illness/substance abuse group therapy.

57. [Respondent-father] reported to Dr. Castillo that he had hallucinations in that he saw and talked to his deceased aunt. [He] also reported that he had eight children by six different women and that five of his children were in the custody of [DSS]. [*Cf.* #109].

58. [Respondent-father] attended a follow-up appointment with Dr. Castillo on July 3, 2013 . . . and his medication was adjusted. A second follow-up appointment was scheduled for August 12, 2013; [respondent-father] no showed for that appointment. . . . [Respondent-father] had a walk-in appointment at Daymark on September 26, 2013 for medication. He reported that he had run out of his medication 25 days prior to that appointment. No change

was made to his medication at that time. [Respondent-father] was last seen at Daymark on September 26, 2013.

. . .

61. On August 16, 2013, [respondent-father] was charged with Possession with intent to Sell and Deliver Marijuana, Possession of Drug Paraphernalia, and Resist/Delay/Obstruct. . . .

62. Between December 2012 and August 2013, [respondent-father] exercised visitation with his children consistently. On August 21, 2013, [he] left the Juvenile Court after he become frustrated with the court due to his visits being suspended[] based upon his inappropriate comments to the children. . . .

. . .

78. On February 24, 2014, [respondent-father] returned to Daymark as a walk-in client for a Comprehensive Clinical Assessment and substance abuse assessment. [Respondent-father] reported daily use of marijuana. [He] was diagnosed with Major Depressive Disorder recurrent severe with psychotic features, Post Traumatic Stress Disorder, Panic Disorder with Agoraphobia, and Cannabis Dependence. . . . [Respondent-father] was again referred for substance abuse treatment group and he agreed to follow that recommendation in order to reunite with his children. [Respondent-father] never reengaged with substance abuse treatment which was scheduled to begin on April 21, 2014. . . .

. . .

98. [Respondent-father] reported that after his visits with the children were suspended . . . on August 21, 2013, he gave up and went to Georgia. He returned to Forsyth County to attempt to reunite with his children and resumed visitation in June 2014.

. . .

102.　[Respondent-father] did not comply with Dr. Sheaffer's recommendations or the orders of the Court regarding recommended treatment.

103.　[Respondent-father] refused to take hair and urinalysis testing required by the Court at the request of [DSS]. . . . The one test [respondent-father] took during the pendency of this case was positive for marijuana.

. . .

105.　[Respondent-father] has not provided any cards or letters for his children since 2012.

106.　[Respondent-father] owns a food cart which he operates with his mother. His work hours are 5:00 p.m. to 4:00 a.m. daily. . . . [Respondent-father] earns $600-$700 per week. He is unwilling to pay any child support for the care and maintenance of his children but is willing to take custody of the children and provide for them.

. . .

108.　At the time of the termination of parental rights hearing, [respondent-father] was not receiving any mental health treatment. . . .

109.　[Respondent-father] is 31 years old and has fathered 13 children by 7 different mothers. He is court ordered to pay child support for one of his children and he is not currently paying any child support.

. . .

120.　[Respondent-father] . . . has failed to engage in necessary mental health and substance abuse treatment which would be required to stabilize his lifestyle and

facilitate in providing a safe home for the children. We agree with the trial court's conclusion that a probability of future neglect is shown by respondent-father's prolonged unwillingness to address the issues of substance abuse and mental illness, as well as his lengthy withdrawal from contact with his children between August 2013 and June 2014.

Respondent-father contests certain of the trial court's adjudicatory findings on the ground that they are incorporated from the court's previous review orders. We agree with respondent-father that facts found at the adjudicatory stage of a termination hearing are subject to a higher standard of proof than is required at a dispositional or review hearing. *See In re White*, 81 N.C. App. 82, 85, 344 S.E.2d 36, 38 (1986).[5] We have therefore disregarded the incorporated findings, which are unnecessary to the court's adjudication under N.C.G.S. § 7B-1111(a)(1). *See In re T.M.*, 180 N.C. App. at 547, 638 S.E.2d at 240–41.

Respondent-father also makes a blanket challenge to the sufficiency of the evidence supporting twenty-two of the trial court's enumerated findings. His assertion appears as a single sentence at the conclusion of respondent-father's briefed

---

[5] We note that the trial court purported to make the findings in its review orders "by clear, cogent and convincing evidence[.]" In light of the relaxed evidentiary rules that prevail at these hearings, however, we choose to disregard these findings insofar as they are incorporated into the adjudicatory portion of the termination order. *Compare* N.C. Gen. Stat. § 7B-906.1(c) (2013), *with* N.C. Gen. Stat. § 7B-1109(f) (2013) (noting that at permanency planning hearings, "[t]he court may consider any evidence, including hearsay evidence . . . or testimony or evidence . . . that the court finds to be relevant, reliable, and necessary," whereas at adjudicatory hearings on termination, "all findings of fact shall be based on clear, cogent, and convincing evidence" with the burden to be placed on the petitioner or movant in the action).

argument. Such a broadside exception, offered without argument as to any individual finding, is ineffectual. *See In re Beasley*, 147 N.C. App. 399, 405, 555 S.E.2d 643, 647 (2001); *see also Dealers Specialties, Inc. v. Neighborhood Hous. Servs.*, 305 N.C. 633, 635, 291 S.E.2d 137, 139 (1982). "Instead, the trial court's findings of fact are binding on appeal[.]" *Beasley*, 147 N.C. App. at 405, 555 S.E.2d at 647. As the trial court's findings support its adjudication under N.C.G.S. § 7B-1111(a)(1), we need not review the court's additional adjudications under *id.* §§ 7B-1111(a)(2), (5), and (6).

Accordingly, the trial court did not err in adjudicating grounds for termination of respondents' parental rights pursuant to N.C.G.S. § 7B-1111(a)(1). The termination order is hereby affirmed.

AFFIRMED.

Judges McCULLOUGH and INMAN concur.

Report per Rule 30(e).