An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-494

Filed: 6 October 2015

Rockingham County, Nos. 10 JT 147, 13 JT 41

IN THE MATTER OF: C.T.M., C.S.F., Jr.

Appeal by respondents from orders filed 5 November 2014 by Judge William F. Southern, III in Rockingham County District Court. Heard in the Court of Appeals 14 September 2015.

*No brief filed by Rockingham County Department of Social Services, petitioner-appellee.*

*J. Thomas Diepenbrock for mother, respondent-appellant.*

*Peter Wood for father, respondent-appellant.*

*Michael A. Kaeding for guardian ad litem.*

ELMORE, Judge.

The parents of C.T.M. (hereinafter referenced by pseudonym of "Carl") and C.S.F., Jr. (hereinafter referenced by pseudonym of "Clarence") appeal from orders terminating their parental rights to their sons. We find no error and affirm the trial court's orders.

## I. Background

At the age of six months, Carl was removed from his parents' home and placed in the custody of the Rockingham County Department of Social Services (DSS) on 23 September 2010 upon the filing of a juvenile petition by DSS. The court adjudicated Carl to be both neglected and dependent on 23 November 2010 based upon several incidents of domestic violence between the parents, sometimes in Carl's presence.

A trial placement of Carl in respondent-mother's home was attempted in January 2012 and ended on 12 March 2012 after the parents engaged in another episode of domestic violence in which respondent-father head-butted respondent-mother, who was pregnant with Clarence, and threw her to the floor. Carl was present in the home during this incident.

Respondent-mother subsequently gave birth to Clarence, and after his birth a second home placement of Carl with his mother was implemented on 29 November 2012. This placement, too, ended on 9 April 2013 because of domestic violence between the parents that occurred during the prior two days. Specifically, respondent-mother struck or "nudged" respondent-father with her car and punched respondent-father on 7 April 2013. The next day, respondent-mother scratched respondent-father's car with a knife. Respondent-father grabbed the knife from her and retaliated by doing the same to her car. He then took a piece of wood approximately the size of a baseball bat and threw it at respondent-mother's car, shattering its windshield. The infant Clarence was in the vehicle at the time.

Respondent-father removed Clarence from the car, and respondent-mother allegedly slapped respondent-father while he was holding Clarence.

On 10 April 2013, DSS filed a petition alleging that Clarence was a neglected juvenile. The court adjudicated Clarence to be a neglected juvenile on 30 July 2013. The court also established a permanent plan of adoption for both Clarence and Carl.

DSS filed motions to terminate parental rights on 20 November 2013. After conducting hearings on 6 and 17 February 2014, the court filed orders on 5 November 2014 terminating the parental rights of both parents. The court terminated the parental rights of each parent to Carl on grounds that they each (1) neglected the child and (2) willfully left the child in foster care for more than twelve months without making satisfactory progress in correcting the conditions which led to the removal of the child. As an additional basis for terminating the parental rights of respondent-mother to Carl, the court concluded respondent-mother failed to provide a reasonable portion of the cost of care for the child for a period of at least six months while the child was in foster care. The court terminated the parental rights of each parent to Clarence on grounds that they each (1) neglected the child and (2) failed to provide a reasonable portion of the cost of care for the child for a period of at least six months while he was in foster care.

Both respondent-mother and respondent-father appeal from the orders terminating their parental rights, arguing that the findings of fact are not supported

by clear, cogent, and convincing evidence and the conclusions of law, in turn, are not supported by the findings of fact.

## II. Analysis

There are two stages involved in termination of parental rights proceedings: adjudication and disposition. *In re D.R.B.*, 182 N.C. App. 733, 735, 643 S.E.2d 77, 79 (2007). In the adjudication stage, the trial court "examines the evidence and determines whether sufficient grounds exist under N.C. Gen. Stat. § 7B-1111 to warrant termination of parental rights." *In re T.D.P.*, 164 N.C. App. 287, 288, 595 S.E.2d 735, 736 (2004), *aff'd per curiam,* 359 N.C. 405, 610 S.E.2d 199 (2005). If the court determines that one or more grounds for terminating a parent's rights exists, it then proceeds to the disposition phase and makes a discretionary determination of whether terminating the parent's rights is in the juvenile's best interest. N.C. Gen. Stat. § 7B-1110(a) (2013).

"The standard of review in termination of parental rights cases is whether the findings of fact are supported by clear, cogent and convincing evidence and whether these findings, in turn, support the conclusions of law." *In re Shepard*, 162 N.C. App. 215, 221–22, 591 S.E.2d 1, 6 (quoting *In re Clark*, 72 N.C. App. 118, 124, 323 S.E.2d 754, 758 (1984)). We review *de novo* the trial court's conclusions of law. *In re S.N.*, 194 N.C. App. 142, 146, 669 S.E.2d 55, 59 (2008) (quoting *Mann Contractors, Inc. v. Flair with Goldsmith Consultants-II, Inc.*, 135 N.C. App. 772, 775, 522 S.E.2d 118,

121 (1999)), *aff'd per curiam*, 363 N.C. 368, 677 S.E.2d 455 (2009). "We then consider, based on the grounds found for termination, whether the trial court abused its discretion in finding termination to be in the best interest of the child." *In re Shepard*, 162 N.C. App. at 221–22, 591 S.E.2d at 6.

We first address the sole common ground upon which each parent's parental rights was terminated: neglect. Parental rights may be terminated pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) if the trial court concludes that the parent has abused or neglected the child. N.C. Gen. Stat. § 7B-1111(a)(1) (2013). A child is neglected when the parent fails to provide proper care, supervision, discipline or a safe environment. N.C. Gen. Stat. § 7B-101(15) (2013). "A finding of neglect sufficient to terminate parental rights must be based on evidence showing neglect at the time of the termination proceeding." *In re Young*, 346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997) (citing *In re Ballard*, 311 N.C. 708, 716, 319 S.E.2d 227, 232 (1984)). The trial court must consider evidence of any changed circumstances since the time of a prior adjudication and the probability that the neglect will be repeated if the child is returned to the parent's care. *In re Ballard*, 311 N.C. at 716, 319 S.E.2d at 232. In predicting the probability of repeated neglect, the trial court "must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." *In re McLean*, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999). The court should consider whether the parent has made "meaningful progress in

eliminating the conditions that led to the removal of [the] children." *In re Leftwich*, 135 N.C. App. 67, 72, 518 S.E.2d 799, 803 (1999).

Both parents take issue with finding of fact number 14, contained in each order, in which the trial court found as follows:

> [Respondent-mother] testified that she currently has no relationship with [respondent-father], and the Court did not receive any evidence to the contrary. Moreover, no evidence was presented of any further domestic violence since the April 2013 incidents. Defense counsel therefore urged the Court to consider the past domestic violence between them to no longer be a concern. The court nevertheless finds, however, that there is a high likelihood of repeated neglect if this child were returned to either parent. Both parents have demonstrated over a long period of time a persistent unwillingness or inability to make necessary changes that would allow them to safely parent, despite participating in numerous services intended to help them. The extremely poor impulse control each parent has shown over the course of this case has not in any way been addressed by either parent since April 2013, and is likely to result in improper care of this child if he were to be returned, whether in the context of domestic violence between the parents, or in some new fashion.

The parents contend that the finding that there is a high probability of repeated neglect if the children are returned to either parent is not supported by clear and convincing evidence, is contrary to the evidence, and is contradicted by the court's findings that the parents no longer have a relationship, have not engaged in domestic violence since April 2013, and have made efforts to comply with their case plans.

In a termination of parental rights proceeding, the trial court assigns weight to the evidence as it deems appropriate and resolves conflicts in the evidence. *In re Oghenekevebe,* 123 N.C. App. 434, 439, 473 S.E.2d 393, 397 (1996). "If different inferences may be drawn from the evidence, the trial judge must determine which inferences shall be drawn and which shall be rejected." *In re Gleisner,* 141 N.C. App. 475, 480, 539 S.E.2d 362, 365–66 (2000). The trial court's findings of fact are binding on appeal "where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary." *In re Montgomery,* 311 N.C. 101, 110–11, 316 S.E.2d 246, 252–53 (1984). Findings of fact that are not specifically challenged on appeal are also binding. *In re P.M.,* 169 N.C. App. 423, 424, 610 S.E.2d 403, 404–05 (2005) (citing *Koufman v. Koufman,* 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991)).

In the termination orders, the trial court prefaced its findings of fact by noting that it had reviewed prior orders entered in each juvenile's case, testimony of numerous witnesses, and exhibits. *See In re M.N.C.,* 176 N.C. App. 114, 120, 625 S.E.2d 627, 632 (2006) (explaining that a court may consider and take judicial notice of prior orders and matters contained in the court file in a termination of parental rights proceeding). Respondents do not challenge the trial court's findings of fact in the termination orders regarding their extensive history of domestic violence. Nor do

they challenge the findings that the domestic violence between them continued despite "significant efforts" by DSS to address the domestic violence issues.

The evidence reflects that not all incidents of domestic violence were directed by one parent toward the other. For example, after respondent-father beat her while she was holding Carl on 8 August 2010, respondent-mother took Carl with her to live with her father and stepmother. While residing there, respondent-mother physically fought her stepmother and brother. During a supervised visitation with Carl on 11 April 2012 at DSS, respondent-father was asked by DSS to leave because he had an "explosive temper" and began using profanity when the child refused to interact with him.

In its permanency planning order entered after the 11 July 2013 review hearing, the trial court found that despite compliance by each parent with various aspects of the parent's services agreement, including participation in a domestic violence counseling program, the domestic violence between the parents had escalated since November 2012. In January 2013, the court recommended that both parents attend counseling with therapist Jay Slayden. Respondent-mother attended two sessions with Mr. Slayden in March 2013 but then missed several appointments. Respondent-father never attended a session with Mr. Slayden and never even called to make an appointment. The DSS social worker testified that even though respondents had separated as a couple as of the time of the termination hearing,

"domestic violence . . . has a history of repeating itself from one situation to another. That is the point of taking the counseling, so you don't engage with another partner to do the same kind of behavior."

The finding that each parent has poor impulse control is supported by each parent's own testimony. Concerning the incident in April 2013, respondent-mother testified on direct examination as follows:

> Q. It was important to you, then, that you do everything you could to avoid another domestic violence incident that would jeopardize your trial home placement, wasn't it?
>
> A. Yes. I tried. I tried talking to [respondent-father], I said.
>
> Q. You did the best you could?
>
> A. No, I didn't. No, I didn't. I came up there. I went to his property that we were supposed to live on together, and I just—I ruined it. I let my—I let my anger get the best of me. I'm sorry.

Concerning this same incident, respondent-father testified on cross-examination as follows:

> Q. Do you think that incident that happened in April of 2013 was significant?
>
> A. What does "significant" mean?
>
> Q. Do you think it was important?
>
> A. Important? I mean, it was important, I guess.
>
> Q. Did you try to take the knife out of [respondent-mother's] hand?

A. Yeah, I tried to take it out.

Q. How come?

A. Because she keyed my car.

Q. With the knife?

A. Yes.

Q. And what were you going to do with the knife when you got it away from her?

A. Key her car.

Q. Did you take a log and smash a window in her car?

A. Yes.

Q. Why did you do that?

A. I can't exactly remember what boiled down to that point. I just remember doing it.

Q. Were you upset?

A. Yes.

Q. Okay. You made statements to [respondent-mother] about what you were going to do to her; you threatened her?

A. I don't remember making no threats to her.

Q. Did she threaten you?

A. No, I don't think she threatened me.

Q. What was she doing when you smashed the window out

of her car?

A. Just all I can remember was her running her mouth.

Q. Okay. What does that mean? What was she saying?

A. I can't recall exactly what all she was saying. I just know she was talking junk.

Q. You knew that the first trial home placement ended as a result—or as a consequence of a domestic violence incident, right?

A. Yes, sir.

Q. You knew that both children were placed with [respondent-mother] on a trial home placement?

A. Yes, sir.

Q. You knew that an incident of domestic violence would end that?

A. Yes, sir.

Q. Were you thinking about that when you decided to put the—break the window out of her car?

A. I think I testified last time that I didn't even know the child was in the car until the window was busted.

Q. Where did you think the child was?

A. At the time, I really wasn't thinking where the child was. I was just thinking about her having the knife and my car getting scratched.

Later in his testimony, respondent-father acknowledged that his "anger kind of took over" during the April 2013 incident. When asked whether he had any counseling

since then, respondent-father stated that he "figured it was no point to continue on trying to seek counseling with that dude for family counseling when we weren't together." Respondent-father's testimony suggests that he lacked awareness of his need for counseling to help him manage his anger and control his impulses. His statement that he "guess[ed]" the incident was important suggests that he failed to appreciate the full import of the incident and the impact domestic violence or poor anger management could have on his children, and also the need for counseling to help him address these issues.

Respondents also challenge the sufficiency of the evidence and findings of fact to support the other grounds for termination of parental rights adjudicated by the court. As only one ground is required to terminate parental rights, it is not necessary for us to address the remaining grounds. *In re P.L.P.,* 173 N.C. App. 1, 8, 618 S.E.2d 241, 246 (2005) (quoting *In re Clark*, 159 N.C. App. 75, 78 n.3, 582 S.E.2d 657, 659 n.3 (2003)), *aff'd per curiam*, 360 N.C. 360, 625 S.E.2d 779 (2006).

### III. Conclusion

We conclude that finding of fact number 14 is supported by clear, cogent, and convincing evidence, and that the findings of fact, in turn, support the conclusion of law in each order that respondents have neglected the juveniles and that there is a high likelihood of repeated neglect if the juveniles were returned to the respondents.

AFFIRMED.

Judges DILLON and DIETZ concur.

Report per Rule 30(e).