An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-302

Filed 19 November 2025

Rockingham County, Nos. 21JT000050-780, 23JT000162-780

IN THE MATTER OF:

A.S.A.

H.S.A.

Appeal by respondent from orders entered 16 December 2024 by Judge James A. Grogan in Rockingham County District Court. Heard in the Court of Appeals 28 October 2025.

> *Candler Law Group, LLC, by Emily Sutton Dezio, for respondent-appellant-mother.*
>
> *Reeves Divenere & Wright, PC, by Anne C. Wright, for petitioner-appellee Rockingham County Health and Human Services.*
>
> *Attorney Beverley A. Smith, for petitioner-appellee Rockingham County Department of Health and Human Services.*
>
> *Rosenwood, Rose & Litwak, PLLC, by Nancy S. Litwak, for appellee Guardian Ad Litem.*

FLOOD, Judge.

Respondent-Mother appeals from the trial court's orders terminating her

parental rights to two of her children, A.S.A. ("Adam") and H.S.A. ("Hennie") (collectively, the "minor children").[1] On appeal, Respondent-Mother argues the trial court, first, erred by terminating Respondent-Mother's parental rights based on insufficient evidence and second, abused its discretion in determining it was in the children's best interests to terminate Respondent-Mother's parental rights. After careful review, we affirm the trial court's orders.

## I. **Factual and Procedural Background**

Respondent-Mother is the biological mother of five children, including Hennie and Adam.[2] Hennie was born on 16 January 2017 and is the third oldest child. Adam was born on 14 March 2022 and is the fourth oldest child.

Rockingham County Department of Social Services ("RCDSS") first became involved with Respondent-Mother in July 2009 following a report concerning substance abuse and supervision related to her two oldest children. After investigating the report, RCDSS offered the provision of in-home services to Respondent-Mother. By 6 January 2010, RCDSS closed in-home services. These early intervention efforts, however, were unsuccessful, and on 10 February 2010, RCDSS received another report similar to the previous report. Due to the repeated safety concerns, RCDSS filed a juvenile petition alleging Respondent-Mother's two oldest

---

[1] Pseudonyms are used to protect the juveniles' identities, pursuant to N.C.R. App. P. 42(b).

[2] Many of the following proceedings involved all of the children, but this procedural history focuses primarily on those involving Hennie and Adam.

children to be neglected and obtained nonsecure custody of the children. On 10 May 2010, Respondent-Mother's two oldest children were adjudicated as neglected juveniles (the "10 May 2010 Adjudication Order").

In April 2021, before Adam was born, RCDSS received a neglect report that alleged Respondent-Mother was using methamphetamine in front of Hennie and her older siblings. RCDSS filed a juvenile petition on 29 April 2021, alleging Hennie and her two older siblings were abused and neglected. On 30 June 2021, Hennie and her two older siblings were adjudicated as abused and neglected juveniles (the "30 June 2021 Adjudication Order"). Due to Respondent-Mother's compliance and progress with her case plan, Hennie and her two older siblings were returned to Respondent-Mother's full-time care on 23 August 2021, and at a post-deposition review hearing on 9 September 2021, the juvenile court terminated its jurisdiction in the juvenile action.

RCDSS became involved again on 9 May 2023 after receiving a neglect report that alleged Hennie and Adam were subject to improper care, domestic violence, and an injurious environment. Specifically, the report alleged the family was homeless, Respondent-Mother's "substance use disorder" was impairing her ability to supervise the minor children, and Respondent-Mother and her boyfriend ("Boyfriend") engaged in domestic violence in front of the minor children.

On 17 July 2023, RCDSS filed a juvenile petition alleging that Respondent-Mother's older children, Hennie, and Adam were neglected juveniles. RCDSS did not

assume nonsecure custody of the children at that time because they had already been placed with a temporary safety provider ("TSP"). Due to concerns regarding the TSP, however, RCDSS had to move the minor children to an alternative TSP. The alternative TSP cared for the minor children for a short time but eventually informed RCDSS that "the care of the children was taking a toll on her health." By August 2023, there were no other family members or friends who were appropriate to serve as temporary safety placement, and on 17 August 2023, RCDSS filed another juvenile petition alleging the minor children were dependent juveniles. Hennie and Adam entered into RCDSS's nonsecure custody later that same day. Following a hearing on 31 August 2023, the trial court entered an order on 28 September 2023, adjudicating the minor children to be neglected and dependent juveniles (the "28 September 2023 Adjudication Order"). Shortly thereafter, the juvenile court terminated its jurisdiction as to Respondent-Mother's two oldest children because they had been placed in custody of their father. Hennie and Adam remained in custody of RCDSS.

Once juvenile jurisdiction terminated over Respondent-Mother's two oldest children, RCDSS presented Respondent-Mother with an updated case plan pertaining to Hennie and Adam. Due to Boyfriend filing for an ex parte domestic violence protective order ("DVPO") against Respondent-Mother in January of 2023 and other domestic disturbance calls to Respondent-Mother's home in 2023, the updated case plan required Respondent-Mother to complete a domestic violence program and "refrain from engaging in any domestic violence incidents[.]"

Respondent-Mother signed the updated case plan on 25 October 2023. Throughout October 2023, Respondent-Mother participated in most scheduled visits with the minor children, engaged in and completed substance abuse programs, completed parenting education courses, and provided negative drug screens.

On 6 January 2024, however, Respondent-Mother was arrested for simple assault—based on an altercation between Respondent-Mother and Boyfriend—and possession of a schedule III-controlled substance. The foster care social worker assigned to the case learned that Respondent-Mother continued to have contact with Boyfriend and was pregnant with his child. Respondent-Mother "acknowledged that she and [Boyfriend] had a toxic relationship, so the couple agreed to go their separate ways[,]" and by 17 January 2024, Boyfriend had removed his personal items from Respondent-Mother's home. On 5 June 2024, however, Boyfriend told a child protective services social worker that he and Respondent-Mother were living together again. Boyfriend also reported that domestic violence was an ongoing problem and identified Respondent-Mother "as the aggressor."

On 13 June 2024, RCDSS filed a motion in the cause to terminate Respondent-Mother's parental rights to the minor children. This matter came on for hearing on 7 November 2024 (the "TPR Hearing"). At the TPR Hearing, the trial court took judicial notice of the 10 May 2010 Adjudication Order, the 30 June 2021 Adjudication Order, the 28 September 2023 Adjudication Order, and an order adjudicating Respondent-Mother's fifth child as a neglected and dependent juvenile (the "21 October 2024

Adjudication Order").[3] The trial court also received testimony from the social worker assigned to the case, the minor children's Guardian ad Litem ("GAL"), and Respondent-Mother.

On 16 December 2024, the trial court entered separate orders terminating Respondent-Mother's parental rights to both Hennie and Adam.[4] Even though the TPR Hearing lasted only forty-one minutes, the trial court made 129 detailed findings of fact regarding Respondent-Mother's extensive history with RCDSS. The trial court ultimately concluded that grounds existed for the termination of Respondent-Mother's parental rights based on neglect and dependency pursuant to N.C.G.S. § 7B-1001(a)(1) and (6), and that termination of parental rights was in the minor children's best interests. Respondent-Mother filed her notice of appeal on 17 January 2024.

## II. Jurisdiction

As a preliminary matter, we must address Respondent-Mother's untimely notice of appeal. Section 7B-1001 provides Respondent-Mother the right to directly appeal "any order that terminates parental rights[,]" *see* N.C.G.S. § 7B-1001(a)(7) (2023), but her "notice to preserve the right to appeal . . . shall be made *within* 30 days after entry and service of the order in accordance with [N.C.]G.S. [§] 1A-1, Rule

---

[3] Respondent-Mother gave birth to her fifth child on 1 June 2024. RCDSS filed a petition in July 2024 alleging Respondent-Mother's fifth child to be a neglected and dependent juvenile. After an adjudicatory hearing, the trial court entered an order, on 21 October 2024, adjudicating Respondent-Mother's fifth child as a neglected and dependent juvenile.

[4] We note that the orders entered on 16 December 2024 also terminated the parental rights for Hennies's unknown biological father, Hennie's legal father, and Adam's unknown biological father. Only Respondent-Mother appeals.

58[,]" *see* N.C.G.S. § 7B-1001(b) (emphasis added). Furthermore, under Rule 3(c)(1) of the Rules of Appellate Procedure, an appellant in a civil action must file and serve a notice of appeal "*within* thirty days after entry of judgment if the party has been served with a copy of the judgment within the three-day period prescribed by Rule 58 of the Rules of Civil Procedure[.]" N.C.R. App. P. 3 (emphasis added). Rule 3 is jurisdictional, and failure to comply with the jurisdictional rules governing the taking of an appeal "precludes the appellate court from acting in any manner other than to dismiss the appeal." *Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.,* 362 N.C. 191, 197 (2008).

Here, Respondent-Mother acknowledges the trial court's dispositional orders were filed on 16 December 2024, and she represents in her brief to this Court that she "filed a timely notice of appeal on 17 January 2025."[5] The certificates of service attached to each of the orders, however, indicate that the trial court's orders were served by mail on 17 December 2024. Because the 17 December 2024 service date fell "within the three-day period prescribed by Rule 58[,]" the 30-day period for timely appealing the trial court's orders ended on 16 January 2025. Respondent-Mother, however, did not file her notice of appeal until Friday, 17 January 2025, one day outside the timeframe to file a notice of appeal. Respondent-Mother's failure to timely file a notice of appeal—even if one day late—is a jurisdictional flaw that deprives this

---

[5] We note Respondent-Mother's notice of appeal was filed on her behalf by her trial counsel, with Respondent-Mother's appellate counsel being subsequently appointed on 4 February 2025.

Court "the authority to act in [this] particular case." *See id.* at 197.

"[T]his Court[, however,] has the discretionary authority, pursuant to Appellate Rule 21, to 'treat the purported appeal as a petition for writ of certiorari and grant it in our discretion.'" *In re E.A.*, 267 N.C. App. 396, 397 (2019) (quoting *Luther v. Seawell*, 191 N.C. App. 139, 142 (2008)). We have previously granted a writ of certiorari where an appellant's "appeal has been lost because of a failure of his or her trial counsel to give proper notice of appeal." *In re J.C.B.*, 233 N.C. App. 641, 645 (2014) (internal quotation marks and citation omitted). Even if an appellant does not petition this Court for a writ of certiorari, this Court "under appropriate circumstances[,]" may issue a writ of certiorari *ex mero motu* "to review the orders of a trial tribunal when the right of appeal has been lost due to failure to take timely action." *See In re I.S.*, 170 N.C. App. 78, 84–85 (2005) (electing to issue a writ of certiorari *ex mero motu* to review the trial court's order because "of the serious consequences of the termination of parental rights, the lack of objection to this error by appellees and the fact that the order referenced in the notice of appeal was clearly an error").

Here, similar to *In re I.S.*, this case involves the serious consequences of terminating Respondent-Mother's parental rights, and RCDSS did not contest Respondent-Mother's failure to comply with Rule 3. Accordingly, we elect to issue a writ of certiorari *ex mero motu* to review the merits of Respondent-Mother's arguments on appeal. *See id.* at 84–85.

### III. <u>Standard of Review</u>

The termination of a parent's parental rights to a juvenile consists of a two-step process: first, the adjudication stage, and second, the dispositional stage. *In re Young*, 346 N.C. 244, 247 (1997). "At the adjudication stage, the party petitioning for the termination must show by clear, cogent, and convincing evidence that grounds authorizing the termination of parental rights exist." *Id.* On appeal, "[w]e review a trial court's adjudication of grounds to terminate parental rights to determine whether the findings are supported by clear, cogent, and convincing evidence and the findings support the conclusions of law." *In re B.A.J.*, 295 N.C. App. 593, 599 (2024) (internal quotation marks and citation omitted). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019). Moreover, "[u]nchallenged findings of fact 'are deemed supported by competent evidence and are binding on appeal.'" *In re B.A.J.*, 295 N.C. App. at 599 (quoting *In re T.N.H.*, 372 N.C. 403, 407 (2019)). "The trial court's conclusions of law are reviewed de novo." *In re Z.G.J.*, 378 N.C. 500, 509 (2021).

At the dispositional stage, "the court shall determine whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a) (2023). On appeal, we review the trial court's determination of a juvenile's best interests for an abuse of discretion. *In re D.L.W.*, 368 N.C. 835, 842 (2016). A trial court abuses its discretion only when "the court's ruling is manifestly unsupported by reason or is so

arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107 (2015) (citing *State v. Hennis*, 323 N.C. 279, 285 (1988)).

## IV. <u>Analysis</u>

On appeal, Respondent-Mother argues the trial court (A) erred by terminating Respondent-Mother's parental rights to the minor children based on insufficient evidence and (B) abused its discretion in determining it was in the minor children's best interests to terminate Respondent-Mother's parental rights. We address each argument, in turn.

### A.  Termination of Parental Rights

Respondent-Mother first argues the trial court erred by terminating Respondent-Mother's parental rights to the minor children because "there was insufficient clear and convincing evidence to support the trial court's findings of fact, and the findings were insufficient to support conclusions of law[.]" Specifically, Respondent-Mother contends (1) most of the trial court's findings of fact are insufficient and (2) the trial court erred by concluding the minor children were neglected juveniles.

At the outset, we note that in her initial brief to this Court, Respondent-Mother challenged certain factual findings in the trial court's order pertaining to Adam but did not challenge any factual findings or conclusions of law in the trial court's order pertaining to Hennie. In her reply brief, Respondent-Mother attempts to "amend[] her brief to cite her challenged findings of fact numerically that matched" the trial

court's order pertaining to Hennie.

Rule 28(b)(6) of the North Carolina Rules of Appellate Procedure provides "[i]ssues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned." N.C.R. App. P. 28. Where an appellant fails to argue or assert authority in support of assignment of errors in her brief, such assignments of error will be deemed abandoned on appeal under Rule 28(b)(6). *In re Leftwich*, 135 N.C. App. 67, 70–71 (1999). Moreover, "where a party fails to assert a claim in its principal brief, [she] abandons that issue and cannot revive the issue via reply brief." *Larsen v. Black Diamond French Truffles, Inc.*, 241 N.C. App. 74, 79 (2015); *see State v. Triplett*, 258 N.C. App. 144, 147 (2018) (stating that an appellant "may not use [her] reply brief to make new arguments on appeal. A reply brief is not an avenue to correct the deficiencies contained in the original brief" (citation modified)).

Here, Respondent-Mother's argument that the trial court erred in terminating her parental rights to Hennie is deemed abandoned because she failed to challenge in her initial brief to this Court any factual findings in the trial court's order for Hennie. *See Leftwich*, 135 N.C. App. at 70–71. While Respondent-Mother attempts to revive the abandoned issue in her reply brief, her reply brief is not the proper avenue to correct the deficiencies in her initial brief to this Court. *See Larsen*, 241 N.C. App. at 79; *see also Triplett*, 258 N.C. App. at 147. By abandoning this issue, all findings of fact in the trial court's order for Hennie remained unchallenged and are thus

binding on appeal. *See In re Z.L.W.*, 372 N.C. 432, 437 (2019) (considering all dispositional findings of fact binding on appeal because the respondent did not challenge any of the trial court's findings of fact). The unchallenged findings of fact also conclusively establish there were grounds to terminate Respondent-Mother's parental rights to Hennie based on neglect and dependency. Accordingly, we limit our review to whether there were grounds to terminate Respondent-Mother's parental rights to Adam.

### 1. *Challenged Findings of Fact in Adam's Order*

Respondent-Mother argues Findings of Fact 9, 11a, 11b, and 13-125 in the trial court's order pertaining to Adam are insufficient to support the trial court's conclusions of law that Adam was a neglected and dependent juvenile. Specifically, Respondent-Mother argues the trial court failed "to demonstrate an independent analysis when it simply copied and pasted the findings from the prior adjudication hearings."

RCDSS concedes there was no evidence admitted at the adjudication stage of the termination hearing to support Findings of Fact 120, 121, and 122. RCDSS also concedes the portions of Finding of Fact 123 that list Boyfriend's needs based on a strengths and needs assessment and that Boyfriend met with RCDSS on 10 October 2024 to enter into a case plan are also not supported by evidence admitted at the termination hearing. As such, we will disregard Findings of Fact 120, 121, 122, and the portion of 123 regarding Boyfriend's strengths and needs in evaluating whether

the trial court erred in determining Respondent-Mother's parental rights to Adam were subject to termination on the basis of neglect. *See In re N.G.*, 374 N.C. 891, 901 (2020) (disregarding a finding of fact that respondent-father had anger issues after concluding it was not supported by the evidence).

As Respondent-Mother contends, "[t]he doctrine of collateral estoppel operates to preclude parties from retrying fully litigated issues that were decided in any prior determination and were necessary to the prior determination." *In re N.G.*, 186 N.C. App. 1, 4 (2007) (internal quotation marks and citation omitted). Nonetheless, "this Court repeatedly has held that a trial court may take judicial notice of earlier proceedings in the same case." *In re W.L.M.*, 181 N.C. App. 518, 523 (2007). When a trial judge takes judicial notice of prior adjudications in a termination of parental rights proceeding, there is a "well-established supposition that the trial court in a bench trial 'is presumed to have disregarded any incompetent evidence.'" *In re J.B.*, 172 N.C. App. 1, 16 (2005) (quoting *In re Huff,* 140 N.C. App. 288, 298 (2000)). While "prior adjudications of abuse or neglect are admissible" in a termination of parental rights proceeding, "they are not determinative of the ultimate issue." *In re J.B.*, 172 N.C. App. at 16. As such, the trial court "must receive some oral testimony at the hearing and make an independent determination regarding the evidence presented." *In re T.N.H.*, 372 N.C. at 410.

Here, Respondent-Mother did not object to the trial court's decision to take judicial notice of the following orders: the 10 May 2010 Adjudication Order, the 30

June 2021 Adjudication Order, the 28 September 2023 Adjudication Order, and the 21 October 2024 Adjudication Order. As such, Respondent-Mother has waived appellate review of the trial court's decision to take judicial notice of the prior orders. *See In re L.N.H.*, 382 N.C. 536, 541 (2022) ("[T]he failure to object to the trial court taking judicial notice of such records waives appellate review of the issue." (citing *In re A.C.*, 378 N.C. 377, 385–86 (2021)).[6]

Respondent-Mother's argument challenging the trial court's use of copy-and-paste findings from the prior adjudication hearings also lacks merit because, as Respondent-Mother acknowledges, this Court has previously held a trial court's orders were not erroneous simply because they contained language that was copied and pasted from a previous order. *See In re J.W.*, 241 N.C. App. 44, 49 (2015). In *In re J.W.*, we clarified that

> this Court will examine whether the record of the proceedings demonstrates that the trial court, through processes of logical reasoning, based on the evidentiary facts before it, found the ultimate facts necessary to dispose of the case[ and if] we are confident the trial court did so, it is irrelevant whether those findings are taken verbatim

---

[6] We note Respondent-Mother also contends the trial court's orders terminating Respondent-Mother's parental rights state the trial court received the 21 October 2024 Adjudication Order into evidence as Exhibit 1, but the orders do not state the trial court took judicial notice of the 21 October 2024 Adjudication Order. Additionally, RCDSS concedes the 21 October 2024 Adjudication Order was not explicitly admitted as Exhibit 1 during the hearing, but contends the transcript indicates that the trial court agreed to take judicial notice of the 21 October 2024 Adjudication Order and RCDSS provided the trial court with a certified copy. We consider this discrepancy to be a scrivener's error because, as the transcript reveals, the trial court stated it would "take judicial notice of" the 10 May 2010 Adjudication Order, the 30 June 2021 Adjudication Order, the 28 September 2023 Adjudication Order, and the 21 October 2024 Adjudication Order.

from an earlier pleading.

. . . .

[I]t would impose an impossible burden on trial court judges if we were to hold that any findings "cut-and-pasted" from a party's pleading automatically warranted reversal of the order. If a trial court, after carefully considering the evidence, finds that the facts are exactly as alleged in a party's pleading, there is nothing wrong with repeating those same words in an order. The purpose of trial court orders is to do justice, not foster creative writing.

*Id.* at 48-49.

Likewise, in the instant case, we reject Respondent-Mother's argument that the trial court's findings were not a result of an independent analysis simply because the trial court "copied and pasted" findings of fact from the previous orders that it took judicial notice of. Instead, we analyze "whether the record of the proceedings demonstrates that the trial court, through processes of logical reasoning, based on the evidentiary facts before it, found the ultimate facts necessary to dispose of the case." *See id.* at 48.

Here, a careful review of the Record persuades us that trial court considered the prior orders as well as additional oral testimony, and subsequently made findings of fact that resolved the material disputes between the parties. For example, the social worker specifically testified that while Respondent-Mother had been cooperative with RCDSS in the underlying juvenile action, Respondent-Mother's history showed that "[a]s soon [RCDSS] is no longer involved, she seems to revert

back [to] the behaviors that caused the removal." The social worker further testified that Respondent-Mother "continues to still reside with [Boyfriend] in who she was in a domestic violent relationship with which was a major concern[,]" and that

> [Respondent-Mother] has stated to [the social worker] that it was not her fault that the kids came into care. She believed that she had a safe plan for them. She's not able to understand how her patterns of behavior are impacting her children and she's not able to articulate to me that although we are offering her these services that she is not changing her behavior. Even though she's utilizing the services, she's not able to -- to explain to us that behavior change or show us that behavior change.

In light of the social worker's testimony regarding Respondent-Mother's behavior, the trial court made the following finding of fact:

> 124. Since 2009, [RCDSS] has received multiple CPS reports on [Respondent-Mother] related to the same risk factors as identified areas of need: parenting, substance abuse, domestic violence, and overall instability. Historically, when [RCDSS] is involved via In-home Services or Foster Care, [Respondent-Mother] willingly participates in and successfully completes the recommended services. However, [Respondent-Mother] has not been able to demonstrate a long-term positive behavioral change related to her areas of need once [RCDSS] ceases to be involved. Overall [Respondent-Mother] has not been able to show behavioral changes necessary to ensure the safety of [Adam], which supports a likelihood that neglected will be repeated by [Respondent-Mother] again should [Adam] be placed in his mother's care. [Respondent-Mother] has not been able to articulate and acknowledge her role in the neglect of [Adam] and to acknowledge the impact of the neglectful environment on her son. [Respondent-Mother] has an ongoing history of involving herself in unhealthy relationships that are characterized by domestic violence as evidenced by the

aforementioned CPS history with . . . . Presently, [Respondent-Mother] continues to maintain an unhealthy relationship with [Boyfriend] and [Boyfriend] continues to suffer from active identified areas of need. Regardless of the domestic violence within her relationship with [Boyfriend], [Respondent-Mother] has been unwilling to seek out a DVPO and/or to physically separate from [Boyfriend]. [Respondent-Mother] has pending criminal charges related to acts of domestic violence perpetrated against [her boyfriend]. Due to [Respondent-Mother's] CPS history coupled with her unhealthy relationship with [Boyfriend] who has active needs himself, the couple's child in common, . . . remains placed outside the home in the custody of [RCDSS]. Lastly, [Respondent-Mother] has failed to be honest and transparent with [RCDSS] as to the [] circumstances. Over the past [fourteen] years, [Respondent-Mother] has not been able to demonstrate an ability or willingness to establish a safe home for her child.

Finding of Fact 124 is supported by the social worker's testimony and is therefore binding on appeal. *See In re B.O.A.*, 372 N.C. at 379. In examining whether Finding of Fact 124 is sufficient, we are confident that the trial court considered the evidence before it, engaged in independent, logical reasoning, and resolved the facts necessary to dispose of the case. *See In re J.W.*, 241 N.C. App. at 49. We therefore reject Respondent-Mother's argument that the trial court's findings were not a result of an independent analysis because it "copied and pasted" the same wording in the previous adjudicatory orders.

### 2. *Grounds to Terminate Respondent-Mother's Parental Rights*

Respondent-Mother next argues the trial court erred by concluding the minor children were neglected juveniles. Specifically, Respondent-Mother argues "[t]he trial

court erroneously based a finding of a probability of future neglect when evidence failed to connect t[he] harm to the children[,]" and "substance use will not support a finding of neglect unless the evidence shows the children have been harmed or [are] at risk of harm from the substance abuse."

Section 7B-1111(a)(1) permits a court to terminate the parental rights where the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. A neglected juvenile is one "whose parent, guardian, custodian, or caretaker . . . [d]oes not provide proper care, supervision, or discipline[,]" or "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15)(a), (e) (2023).

"Although prior adjudications of neglect may be admitted and considered by the trial court, they will rarely be sufficient, standing alone, to support a termination of parental rights, since the petition must establish that neglect exists at the time of hearing." *In re Shermer*, 156 N.C. App. 281, 286 (2003). Where there has been a prior adjudication that a juvenile has been neglected, but the parent lost custody of the child for a significant period of time before the TPR proceeding, the trial court "must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. 708, 715 (1984). "In predicting the probability of repetition of neglect, the court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." *In re M.P.M.*, 243 N.C. App. 41, 48 (2015) (internal

quotation marks and citation omitted).

A relevant consideration for the probability of a repetition of neglect is whether the respondent makes "meaningful progress in eliminating the conditions that led to the removal of her children." *In re Leftwich*, 135 N.C. App. at 72. "[A] parent's compliance with his or her case plan[, however,] does not preclude a finding of neglect." *In re J.J.H.*, 376 N.C. 161, 185 (2020) (citing *In re D.W.P.*, 373 N.C. 327, 339–40 (2020)); *see In re M.C.*, 374 N.C. 882, 889 (2020) (noting the respondent's progress in a case plan did not contradict the trial court's determination that there was a likelihood of a repetition of neglect because the evidence showed the respondent refused "to acknowledge the effect of domestic violence on the children" and was unable "to sever her relationship with" an unsafe parent).

In *In re D.W.P.*, our Supreme Court affirmed an order terminating the respondent's parental rights on the basis of neglect. 373 N.C. at 339–40. Guilford County Department of Health and Human Services received a report that the respondent's eleven-month old son was being treated for a broken femur and several other, older fractures that were in the process of healing. *Id.* at 328. The respondent attributed her son's broken femur to the family's seventy-pound dog but suggested her son's biological father had inflicted the older injuries. *Id.* Due to his young age and the multiple fractures for which the respondent and her fiancé could not provide a plausible explanation, the Guilford County Department of Health and Human Services filed a petition and obtained nonsecure custody of the respondent's son and

daughter. *Id.* During the termination hearing, the respondent testified that she and her fiancé had ended their relationship but later reconnected while her children were in foster care. *Id.* at 333. The trial court adjudicated the respondent's son to be abused and neglected and the respondent's daughter to be neglected even though she did not have any injuries. *Id.* at 329. In reviewing the evidence, the trial court's findings of fact focused primarily on the respondent's refusal to honestly report how her son's injuries occurred. *Id.* The trial court concluded there was a likelihood of future neglect and terminated the respondent's parental rights to both children. *Id.*

In holding the findings of fact supported the trial court's conclusion that the neglect was likely to reoccur if the children were returned to the respondent's care, our Supreme Court discussed how the respondent's own testimony showed she was "unable to recognize and break patterns of abuse that put her children at risk." *Id.* at 340. Our Supreme Court was specifically "troubled by [the respondent's] continued failure to acknowledge the likely cause of [her son]'s injuries[,]" and her refusal "to make a realistic attempt to understand how [her son] was injured or to acknowledge how her relationships affect her children's wellbeing." *Id.* at 339–40. Our Supreme Court also noted the respondent had completed parenting classes, attended therapy, and regularly visited with her children, but nonetheless concluded the evidence supported the trial court's "conclusion that [the] respondent[] has not made reasonable progress in correcting the conditions that led to the children's removal, and the children are likely to suffer neglect in the future." *Id.* at 340.

Likewise, in the instant case, the trial court's findings of fact support the trial court's conclusion that the neglect was likely to recur if the minor children were returned to Respondent-Mother's care. Similar to the respondent in *In re D.W.P.*, Respondent-Mother rekindled her "toxic" relationship with Boyfriend and was living with him even though domestic violence incidents continued to occur. *See id.* at 333. While the Record indicates Respondent-Mother did make some changes, Respondent-Mother testified there was nothing else she could do because she had "done everything that [RCDSS] asked [her] to do." Yet, Respondent-Mother continued to allow Boyfriend to live with her even though she knew the domestic violence incidents that occurred between her and Boyfriend were a major concern of RCDSS. Moreover, despite attending classes provided by RCDSS, the social worker testified that, even with these services, Respondent-Mother has "not able to understand how her patterns of behavior are impacting her children" and has not been able to show "that behavior change." Such facts support the trial court's determination that Respondent-Mother has failed to demonstrate an ability or willingness to establish a safe home for the minor children. *See id.* at 337. Thus, the trial court's findings support the trial court's conclusion that the neglect is likely to reoccur if the children are returned to Respondent-Mother's care.

The trial court's conclusion that there is a likelihood of future neglect is also supported by the trial court's findings regarding Respondent-Mother's history of substance abuse. Respondent-Mother contends, however, that "substance use will not

support a finding of neglect unless the evidence shows the children have been harmed or [are] at risk of harm from the substance abuse."

Generally, "[a] mere showing that a parent has abused alcohol or drugs is insufficient to terminate parental rights." *In re D.T.N.A.*, 250 N.C. App. 582, 585–86 (2016). If the respondent has used substances before, the petitioner has the "burden of proving that substance abuse would prevent [the] [r]espondent from providing for the proper care and supervision of the children." *See In re A.G.M.*, 241 N.C. App. 426, 440 (2015). A substance abuse problem that goes "untreated could inhibit a parent's capability or willingness to consistently provide adequate care to a child." *See In re D.L.A.D.*, 375 N.C. 565, 572 (2020). Moreover, evidence that shows a respondent has not successfully addressed his or her substance abuse issues except for when he or she is incarcerated or enrolled in a substance abuse program may support a trial court's determination that there is a reasonable probability of repetition of neglect. *See In re J.H.K.*, 215 N.C. App. 364, 371 (2011) (affirming the trial court's conclusion of law that the juveniles were neglected because the evidence showed that even though the respondent had made efforts towards sobriety while incarcerated, "his success at sobriety while incarcerated was not indicative of how he would manage his addiction when released from custody").

Regarding Respondent-Mother's history of substance abuse, the trial court made the following finding of fact:

125. [Respondent-Mother] has consistently tested negative

for illicit substances since [RCDSS] became involved with the family in 2023; however, over the past [fourteen] years, [Respondent-Mother] has not been able to demonstrate a long-term commitment to sobriety and ongoing participation in substance abuse services to prevent relapse.

Similar to *In re J.H.K.*, the trial court in the instant case acknowledged Respondent-Mother's successful advances toward sobriety but nonetheless found that her sobriety "was not indicative of how [s]he would manage [her] addiction when" RCDSS was not involved. *See In re J.H.K.*, 215 N.C. App. at 371. While the evidence indicates Respondent-Mother tested negative for illegal substances in August 2023 and October 2023, these instances were when Respondent-Mother was enrolled in substance abuse programs as part of her case plan. As the Record indicates, however, Respondent-Mother would attend substance abuse programs, but would relapse after RCDSS was no longer involved.[7] In considering Respondent-Mother's history and the social worker's testimony detailing how Respondent-Mother seems to "revert back [to] the behaviors that caused the removal[]" when RCDSS ceases involvement, the trial court could reasonably conclude there was a reasonable probability of repetition of neglect. *See In re M.P.M.*, 243 N.C. App. at 48. As such, the trial court's findings of fact support the trial court's conclusion that there was a likelihood of future neglect

---

[7] The Record indicates the reports of neglect RCDSS received on 14 July 2009, 6 April 2021, and 9 May 2024 alleged Respondent-Mother was using illegal substances. In April 2021, Respondent-Mother admitted to using illegal substances. Respondent-Mother also tested positive for methamphetamine on 19 May 2023.

by Respondent-Mother.

Accordingly, we hold the trial court did not err in determining there were grounds to terminate Respondent-Mother's parental rights under N.C.G.S. § 7B-1111(a)(1). Since we hold there were grounds to terminate Respondent-Mother's parental rights based on neglect under N.C.G.S. § 7B-1111(a)(1), we need not address Respondent-Mother's contention that the trial court erred in determining there were grounds to terminate her parental rights based on the remaining ground of dependency. *See In re Clark*, 159 N.C. App. 75, 84 (2003) ("[W]here we determine the trial court properly concluded that one ground exists to support the termination of parental rights, we need not address the remaining grounds.").

## B. Best Interests Determination

Respondent-Mother lastly argues the trial court abused its discretion by finding it was in the minor children's best interests to terminate Respondent-Mother's parental rights. Specifically, Respondent-Mother contends "it is not clear that the trial court considered all of the statutory factors" under N.C.G.S. § 7B-1110(a), and "there is no detailed explanation of the weight provided to the factors." We disagree.

Section 7B-1110(a) provides that in determining whether terminating the parent's rights is in the child's best interests, the trial court must consider the following factors:

(1) The age of the juvenile.

(2) The likelihood of adoption of the juvenile.

(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.

(4) The bond between the juvenile and the parent.

(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6) Any relevant consideration.

N.C.G.S § 7B-1110(a). Indeed, the trial court must consider each factor, but the trial court is not required to make written findings to each factor. *In re A.U.D.*, 373 N.C. 3, 10 (2019) (holding that N.C.G.S. § 7B-1110(a) does not "explicitly require written findings as to each factor").

Here, Respondent-Mother does not challenge Findings of Fact 125-129; thus, they are binding on appeal. *See In re T.N.H.*, 372 N.C. at 407 ("Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." (citation omitted)). These findings of fact demonstrate that the trial court considered each factor as set forth in N.C.G.S. § 7B-1110(a). Specifically, Finding of Fact 126 states:

> 126. In determining whether terminating the parental rights is in the best interests of the minor child, the Court considered the factors set out in N.C.G.S. § 7B-1110(a), heard testimony on this subject from the social worker, . . . the GAL volunteer, . . . and [Respondent-Mother]. The Court also received a Report to the Court prepared by GAL volunteer, . . . who was available for questioning and cross-examination as to the content of the Report the Court. Due to different standard of proof at this stage of proceeding,

the Court has also reviewed previous orders and reports to the Court in the underlying juvenile file.

a. [Adam] was born [14 March 2022], so he is currently two years old. [Adam] is still at a tender age where adoption is a strong likelihood.

b. On or about [15 September 2023], [Adam] and his half-sibling, [Hennie], were placed with [Foster Mom] and [Foster Dad], a fictive kin placement identified by [Respondent-Mother]. The [Foster] family is a prospective adoptive family for both [Adam] and [Hennie]; both children have been in this placement in excess of a year.

c. [Adam] is strongly bonded with [Foster Mom] and [Foster Dad]. [Adam] was only a year old when placed with [Foster Mom] and [Foster Dad], so these placement providers have been consistent caregivers to the child during his young life. [Adam] suffered from delays when he entered . . . but he has shown a great deal of growth since being placed with [Foster Mom] and [Foster Dad].

d. [Adam] does not have a maternal bond with his mother, [Respondent-Mother]. The bond between [Adam] and [Respondent-Mother] is similar to a sibling bond. [Adam] does not have a bond with his unknown father.

e. The primary permanent plan for [Adam] is adoption, and there is strong likelihood that [Foster Mom] and [Foster Dad] will adopt the minor child if he is legally freed for adoption.

f. The termination of parental rights is the only impediment to moving forward with achieving the primary plan of adoption for the minor child.

Although not required, Finding of Fact 126 undoubtedly demonstrates that the trial court employed "the better practice" of making written findings as to all statutory factors. *See In re A.U.D.*, 373 N.C. at 10 ("Although the better practice would have

been for the trial court to make written findings as to the statutory factors identified by [the adoption agency], we are unable to say that the trial court's failure to do so under the unique circumstances of this case constitutes reversible error.").

Moreover, although Respondent-Mother notes the trial court did not provide a detailed explanation of the weight provided to the factors, the trial court was not required to do so. *See In re T.H.*, 266 N.C. App. 41, 46–47 (2019) (holding the trial court is "entitled to give greater weight to certain factors over others in making its determination concerning the best interest of a child[,]" but under N.C.G.S. § 7B-1110(a), the trial court is only "required to make written findings regarding those factors that are relevant"). Furthermore, because it is well-established that it is entirely within the trial court's discretion to decide how each factor listed in N.C.G.S. § 7B-1110(a) is weighed, we will not "substitute our preferred weighing of the relevant statutory criteria for that of the trial court[.]" *See In re I.N.C.*, 374 N.C. 542, 550–51 (2020). Accordingly, the trial court did not abuse its discretion in determining that the termination of Respondent-Mother's parental rights was in the best interests of the minor children. *See In re B.A.J.*, 295 N.C. App. at 612.

## V. <u>Conclusion</u>

Upon careful review, we conclude the unchallenged findings in the trial court's order pertaining to Hennie conclusively establish there were grounds to terminate Respondent-Mother's parental rights based on neglect pursuant to N.C.G.S. § 7B-1111(a)(1). Likewise, there is clear, cogent, and convincing evidence to support the

trial court's findings of fact, and the findings of fact support the trial court's conclusion of law that grounds existed to terminate Respondent-Mother's parental rights to Adam for neglect pursuant to N.C.G.S. § 7B-1111(a)(1). Further, the trial court did not abuse its discretion in determining it was in the children's best interests to terminate Respondent-Mother's parental rights because the trial court considered all relevant factors under N.C.G.S. § 7B-1110. Accordingly, we affirm the trial court's orders terminating Respondent-Mother's parental rights to Hennie and Adam.

AFFIRMED.

Judges COLLINS and MURRY concur.

Report per Rule 30(e).